No. 16-3131

# In the
# United States Court of Appeals
## for the Seventh Circuit

MERYL SQUIRES-CANNON, et al.,

*Plaintiffs-Appellants,*

v.

FOREST PRESERVE DISTRICT OF COOK COUNTY,
ILLINOIS, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:14-cv-05611.
The Honorable **Sara L. Ellis**, Judge Presiding.

## BRIEF AND SHORT APPENDIX OF PLAINTIFFS-APPELLANTS
## MERYL SQUIRES-CANNON, RICHARD KIRK CANNON,
## ROYALTY PROPERTIES, LLC and CANNON SQUIRES PROPERTIES, LLC

RICHARD K. CANNON
LAW OFFICES OF CANNON & ASSOCIATES
117 South Cook Street
#361
Barrington, Illinois 60010
(847) 381-1600

*Attorneys for Plaintiffs-Appellants
Meryl Squires-Cannon, Richard K. Cannon*



COUNSEL PRESS · (866) 703-9373          PRINTED ON RECYCLED PAPER



**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 16-3131

Short Caption: MERYL SQUIRES-CANNON, et al., v. FOREST PRESERVE DIST. OF COOK COUNTY, IL, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

MERYL SQUIRES-CANNON; RICHARD KIRK CANNON (pro se);

ROYALTY PROPERTIES, LLC;

CANNON-SQUIRES PROPERTIES, LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Law Offices of CANNON & ASSOCIATES

(3) If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        N.A.

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

        N.A.

Attorney's Signature: s/ Richard Kirk Cannon      Date: August 12, 2016

Attorney's Printed Name: Richard Kirk Cannon

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☒  **No** _____

Address: The Law Offices of Cannon & Associates; 117 S. Cook St., #361, Barrington, IL 60010

Phone Number: (847)381-1600      Fax Number: (847)381-6650

E-Mail Address: rkcannon@cannoniplaw.com

rev. 01/15 GA

## TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES .............................................................................................iv

JURISDICTIONAL STATEMENT .....................................................................................2

STATEMENT OF THE ISSUES. .......................................................................................2

STATEMENT OF THE CASE .............................................................................................3

    Detailed Procedural Background ....................................................................................7

SUMMARY OF THE ARGUMENT ................................................................................18

STANDARDS OF REVIEW............................................................................................21

I.   ARGUMENT..............................................................................................................23

    A.  Legal Standard for Rule 12(b)(6) Motions to Dismiss......................................... 23

    B.  Counts I and II: The SAC Plausibly Alleges That the FPD Violated the
       Takings Clause of the Fifth Amendment, As Applied to States Through the
       Fourteenth Amendment .................................................................................... 24

        1.   DIRECT TAKINGS. ..................................................................................25

           a)   Erecting Large Signs on Private Estate Inviting Public Access and Use................ 25

           b)   Coercively Taking Ownership Through Government-Manipulated Subterfuge
               of Sham Foreclosure................................................................................. 26

           c)   Entering the Estate and Tearing Down Miles of Expensive Permanent
               Improvement Equine Fencing.........................................................................30

        2.   REGULATORY TAKINGS ......................................................................... 31

    C.  Count IV: Contrary to the District Court's Improper Finding, The SAC Adequately
       Alleges That Plaintiffs Relied Upon Keldermans' Fraudulent Misrepresentations
       and Omissions and That Plaintiffs Suffered Damages Therefrom ...................... 35

        1.   Facts Establishing Plaintiffs' Reliance Were Adequately Alleged. ............... 37

        2.   Plaintiffs Alleged Facts Establishing Damages From Keldermans' Fraud ..... 38

D.  Count VI:  The SAC Adequately Alleges That the McGinley Defendants, at the FPD's Request, Fraudulently Misrepresented the Identity of the Potential Purchaser to Plaintiffs........................................................................ 40

E.  Counts III and V:  Claims That Defendants Conspired and Aided and Abetted FPD's Unconstitutional Taking of the Estate and the Keldermans Fraud ........................ 41

II.  CONCLUSION ......................................................................................................... 42

# TABLE OF AUTHORITIES

*Advincula v. United Blood Services*,
  176 Ill.2d 1, 678 N.E.2d 1009, 223 Ill.Dec. 1, 65 USLW 2472,
  75 A.L.R.5th 659 (1996)....................................................................................22, 31

*AnchorBank, FSB v. Hofer*,
  649 F.3d 610, 615, 2011 WL 3629726 (7th Cir. 2011) ...........................................35

*Arazie v. Mullane*,
  2 F.3d 1456 (7th Cir. 1993)..............................................................................23, 35

*Armstrong v. United States*,
  364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)..................................................32

*Ashcroft v. Iqbal*,
  556 U.S. 662 ---, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)................................23, 24

*Auer v. Robbins*,
  519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)........................................33

*Baker v. Forest Preserve District of Cook County*,
  2015 IL App (1st) 141157, 393 Ill.Dec. 1, 33 N.E.3d 745 ......................................27

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ..........................................23

*Bettendorf v. St. Croix Cty.*,
  631 F.3d 421 (7th Cir. 2011) ............................................................................... 31

*Bowles v. Seminole Rock & Sand Co.*,
  325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)................................................33

*Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*,
  659 F.2d 695 (5th Cir. 1981), *cert. denied*,
  457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982).........................................21

*City of Chicago v. Loitz*,
  329 N.E.2d 208, 61 Ill.2d 92 (1975).......................................................................34

*Cohen v. Am. Sec. Ins. Co.*,
  735 F.3d 601 (7th Cir. 2013)........................................................................... 35, 37

*Conley v. Gibson*,
  355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)...........................................23, 35, 37

*Connick v. Suzuki Motor Co.*,
    174 Ill. 2d 482, 675 N.E.2d 584 (1996) ................................................................37

*Forum Corp. of N. Am. v. Forum, Ltd.*,
    903 F.2d 434 (7th Cir. 1990) ................................................................21

*Garley v. Columbia LaGrange Hosp.*,
    377 Ill.App.3d 678, 881 N.E.2d 370, 317 Ill.Dec. 202 (1st Dist. 2007) ....................15

*Gibson v. City of Chicago*,
    910 F.2d 1510 (7th Cir. 1990) ................................................................23

*Goodpaster v. City of Indiannapolis*,
    736 F.3d 1060 (7th Cir. 2013) ................................................................34

*Hadley v. Illinois Dept. of Corrections*,
    224 Ill.2d 365, 864 N.E.2d 162, 309 Ill.Dec. 296 (2007) ...............................22

*Horne v. Dep't of Agric.*, --- U.S. ----,
    135 S. Ct. 2419, 192 L. Ed.  2d 388 (2015) ................................................................31

*In re Complaint of Holly Marine Towing*,
    2002 WL 31415758 (N.D.Ill. 2002) ................................................................23

*In re Marriage of Lehr*,
    317 Ill.App.3d 853, 251 Ill.Dec. 336, 740 N.E.2d 417 (2000) ................................15

*King v. Burwell*,
    135 S.Ct. 2480, 192 L.Ed.2d 483 (2015) ................................................................22

*Klump v. U.S.*,
    50 Fed.Cl. 268 (Fed. Cl. 2001) ................................................................30

*Landgraf v. USI Film Products*,
    511 U.S. 244 (1994) ................................................................34

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) ................................................................25

*Lucas v. South Carolina Coastal Council*,
    505 U.S. 1003, 112 S.Ct. 2886 (1992) ................................................................25, 31

*Mitchell v. Skubiak,*
    248 Ill.App.3d 1000, 618 N.E.2d 1013, 188 Ill.Dec. 443 (1993) ............................................36

*Ohle v. Neima Marcus Group,*
    2016 IL App. (1st) 141994, 65 N.E.3d 850, 408 Ill.Dec. 374 (2016) ........................................22

*Penn. Coal Co. v. Mahon,*
    260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922) ...................................................... 31

*PSL Realty v. Granite Inv. Co.,*
    86 Ill.2d 291 (1981) ............................................................................................15

*Reger Dev., LLC v. Nat'l City Bank,*
    592 F.3d 759 (7th Cir. 2010) ............................................................................... 23

*Reid v. Harvey Motorcycle & Camper,*
    No. 05  C 5375, 2007 WL 4277435 (N.D.Ill. 2007) ...............................................37

*Roberts v. Sea-Land Services, Inc.,*
    566 U.S. 93, 132 S.Ct. 1350, 182 L.Ed.2d 341 (2012) .........................................22, 31

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) ...........................................33

*Rose Acre Farms, Inc. v. Madigan,*
    956 F.2d 670 (7th Cir. 1992) ...............................................................................24

*Russow v. Bobola,*
    2 Ill. App. 3d 837, 277 N.E.2d 769 (2d Dist. 1972) ...........................................36, 37

*Schwinn Bicycle Co. v. Ross Bicycles, Inc.,*
    870 F.2d 1176 (7th Cir. 1989) ..............................................................................21

*Slepicka v. Illinois Dept. of Public Health,*
    2014 IL 116927, 21 N.E. 368, 372, 386 Ill.Dec. 605, 609 (2014)............................22

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) ...........................................25

*Tamayo v. Blagojevich,*
    526 F.3d 1074 (7th Cir. 2008) ..............................................................................23

*Walcek v. United States,*
    49 Fed. Cl. 248 (2001), *aff'd,* 303 F.3d 1349 (Fed. Cir. 2002) ..................................32

*Weidner v. Karlin*,
    402 Tll. App. 3d 1084, 932 N.E.2d 602 (3d Dist. 2010) ............................................. 35


**Rules, Statutes, and Other Authorities**

70 TLCS 810/0.01 *et seq.* .......................................................................................... 9, 26

70 TLCS  810/11-15 ...................................................................................................... 14

28 U.S.C. § 1291 ............................................................................................................. 1

28 U.S.C. §1331 .............................................................................................................. 1

28 U.S.C. §1346(b) ......................................................................................................... 1

28 U.S.C. §1367 .............................................................................................................. 1

28 U.S.C. §§2671-80 ...................................................................................................... 1

735 TLCS 5/15-1507(a) ................................................................................................ 12

735 TLCS 5/15-1508(b) ................................................................................................ 13

735 TLCS 5/15-1509(a) ................................................................................................ 13

Fed.R.Civ.P. 9(b) ...................................................................................................... 21, 35

Fed.R.Civ.P. 12(b)(6) .............................................................................................. *passim*

Fed.R.Civ.P 71.1(h) ...................................................................................................... 26

Fed.R.Civ P. 71.1(h)(1)(A) ................................................................................... 4, 13, 26

*Couple battle forest preserve over Barrington Hills estate*, Daily  Herald, Sept. 16, 2013, *at*
    http://www.dailyherald.com/article/20130916/news/709169665/ .......................... 4, 13

U.S. CONST. amend.V and XTV ................................................................................... 24

# JURISDICTIONAL STATEMENT

**(A) Jurisdiction of the District Court.**

Based on the Second Amended Complaint ("SAC") [R60], the District Court has subject matter jurisdiction: over Counts One and Two pursuant to 28 U.S.C. §1331 (Federal Question) based on allegations of two separate and distinct violations of the United States Constitution by the Forest Preserve District of Cook County ("FPD") (Takings Clause of the Fifth Amendment, as applied to the States through the Fourteenth Amendment); and over Count Three (alleging Conspiracy, by the United States, for FPD to Violate the Takings Clause) pursuant to the Tort Claims Act under 28 U.S.C. §1346(b) and §§2671-80. Supplemental jurisdiction was founded on 28 U.S.C. §1367 over Counts Three (Conspiracy, by the non-governmental defendants, for FPD to violate the Takings Clause), Four (Fraudulent Misrepresentation and Concealment by Keldermans and FPD), Five (Conspiracy and Aiding and Abetting Keldermans Fraud, by all defendants except USA), and Six (alleging Fraudulent Misrepresentation And Concealment By McGinleys and FPD), in that the state-law claims of Counts Three through Six were so related to the federal claims as to form part of the same case or controversy.

**(B) Jurisdiction of the Court of Appeals.**

Jurisdiction of the Court of Appeals is based upon 28 U.S.C. § 1291, in that this is an appeal from a judgment founded on the final decision of a district judge of the Northern District of Illinois, a district embraced by this Court.

**(C) Timeliness of the Appeal.**

This appeal was timely filed based on the following dates and events:

      (i)      The judgment sought to be reviewed was entered on May 9, 2016; [A1-16; A17]

     (ii)     June 6, 2016, Plaintiffs/Appellants timely filed their *Plaintiffs' Motion For Relief From Judgment Under … Rule 59(e) and Rule 60(b).* [R83]

     (iii)    The Order denying *Plaintiffs' Motion For Relief From Judgment Under … Rules 59(e) and Rule 60(b)* was entered on June 10, 2016. [R85]

     (iv)    Since the United States is a party, under Appellate Rule 4(a)(1)(B)(i) the Notice of Appeal was timely filed on August 8, 2016 [R86], which is within 60 days after entry of the Order denying relief under Rules 59(e) and 60(b), pursuant to Appellate Rules 4(a)(4)(a)(v) and 4(a)(4)(a)(vi).

**(D) Finality of Order Adjudicating All Claims**

This appeal is from the final judgment [A17] and from the "Opinion And Order" for same [A1-A16], which adjudicates and disposes of all outstanding claims.

## STATEMENT OF THE ISSUES

Did the District Court err in making findings of fact in the context of motions to dismiss the Complaint under Rule 12(b)(6), Fed.R.Civ.P.?

Did the District Court err in failing to treat the allegations of the Complaint as true, in the context of the motions to dismiss the Complaint under Rule 12(b)(6), Fed.R.Civ.P.?

Did the District Court erroneously apply the law governing each of the claims pleaded in the Complaint?

Did the district court err in granting Defendants' motions to dismiss each of the claims pleaded in the Second Amended Complaint?

**STATEMENT OF THE CASE**

This is an appeal from dismissal of all claims asserted by Plaintiffs against Defendants [A1-A16; A17][1].

The main focus of this case is Plaintiffs' claims that a unit of local government coercively took title to privately-owned property without providing just compensation to the owners, in violation of the Takings Clause of the Fifth Amendment of the United States Constitution as applied to the states under the Fourteenth Amendment. Rather than comply with laws of Eminent Domain, which require establishing a prevailing public purpose and a jury determination of the fair market value of the property in order to provide just compensation *to the owners*, Defendant Forest Preserve District of Cook County ("FPD") purchased the existing Note and mortgage on the property from Defendant Harris Bank, N.A. ("Harris") using taxpayer funds, and foreclosed - bidding just the amount of the Note - leaving the owners with no compensation whatsoever for the equity in their property. FPD used its governmental powers to ensure there were no other bidders at the foreclosure sale, enabling FPD to be the winning (only) bid at a greatly reduced price millions of dollars below its admitted value.

Further, Plaintiffs allege FPD purchased the Note by deceit and subterfuge, behind closed doors shielded from public scrutiny in violation of the Open Meetings Act, while instructing its outside counsel (Defendant "Keldermans") to fraudulently negotiate with the property owners by falsely misrepresenting to them, verbally [R60-2pp20,65] and in writing [R.60-2pp18,67-71], that the identity of the potential purchaser of their Note was a group of private individuals operating as "Horizon Farms Loan Acquisition LLC, an Illinois limited liability company to be

---

[1] References to "R__p__" indicate the docket number and page number (or paragraph number, as applicable) of items part of the district court record; e.g., "R20p9¶1" refers to Docket No. 20, page 9, para.1. References to "A__" indicate the page of referenced material in the Appendix.

formed", and that FPD did so because:   FPD knew from earlier contacts that the property

owners, Plaintiffs herein, were opposed to turning their property into forest preserve; [R60-2p33

line 8, through p34 line 5] and, FPD wanted to prevent Plaintiffs from learning about, and

then timely objecting to and opposing FPD Board approval of FPD's use of taxpayer funds

to purchase a Note and mortgage for the admitted purpose of coercively taking title to

property while circumventing laws of Eminent Domain and without paying just compensation

to the owners.

     After acquiring the Note and mortgage and judgment thereon, and *before* the scheduled

foreclosure auction, there were further FPD governmental acts: using its government power

announcing to the press that it already owned the property; using public taxpayer funds to enter

onto and erect large signs at the property entrances as notification that it already was part of and

owned by the "Forest Preserve District" thereby inviting public entry and use [R60p7¶30]; using

governmental powers to enact an Ordinance  [R.60-1pp22-29] converting the property into

public forest preserve[2] and that FPD would use its government power to take title by

condemnation if it was not the successful bidder at the foreclosure auction [R.60-1p29§3] –

which Plaintiffs alleged was FPD using governmental powers to control, discourage and prevent

competitive bids at the foreclosure sale, resulting in FPD being the only bidder at a price millions

---

[2] Taken out of context from the then-pending foreclosure auction, the District Court viewed the Ordinance as "merely entail planning for future acquisition of the property". (A2¶2) However, if properly interpreted in context of: its requirement that FPD *shall* acquire the property [R60-1p25§1] enforceable by condemnation [R60-1p29§3]; its enactment just two weeks prior to the *already-scheduled FPD-controlled foreclosure auction* [R60-1p22]; use of taxpayer funds to erect large metal signs on the property at its entrances indicating already-existing FPD ownership (itself a taking); government press releases that it was acquired by FPD *to prevent development by any other purchaser* [http://www.dailyherald.com/article/20130916/news/709169665/]; and the simultaneous authorization to use public tax dollars and assets to bid at foreclosure auction [R60-1p31¶¶2-4]; the Ordinance constitutes an Unconstitutional regulatory Taking.

of dollars below the admitted property value. Thus, Plaintiffs alleged, the property owners were cheated out of the equity they had in their property coercively taken by the FPD without just compensation.

Plaintiffs also alleged that FDIC and other defendants conspired with FPD to encourage, aid and abet its illegal Takings and fraud, including: approving and agreeing in writing to fraudulent misidentification of the potential purchaser of the Note and mortgage;[3] [R60-1p8¶2; R60-2p23] actively concealing and participating in further false and misleading statements and omissions, to the owners [R60-2pp67-71; R60-2p73] and to the foreclosure court [R60-2pp38-58], to shield the identity of the potential Note purchaser and prevent Plaintiffs from timely opposing FPD Board approval of the Note purchase using taxpayer funds, and that Defendants FPD and Keldermans conspired with Robert McGinley to encourage, aid and abet his separate frauds of falsely stating that a "group of neighbors" was interested in sharing title with Plaintiffs.

The above was alleged in great detail by Plaintiffs in their Second Amended Complaint ("SAC") [R60] and attached supporting exhibits. [R60-1; R60-2] Defendants moved to dismiss under Fed.R.Civ.P. 12(b)(6). The District Court sitting in Cook County repeatedly conveyed personal skepticism and reluctance to hold politically-powerful Cook County government, FDIC, Harris and other defendants accountable for illegal and fraudulent acts [A2¶2], instead basing dismissal of all claims on erroneous and inappropriate rulings, many of which are dependent upon issues of fact which Plaintiffs are entitled to have tried to a jury.

---

[3] "Prior to submission of the Pre-Negotiation Agreement to Borrowers [Plaintiffs herein], Buyer [FPD] shall submit the … Agreement to Seller [Harris] for Seller to approve …" [R.60-1p8¶2]

Plainitiffs contend that District Court improperly and erroneously:

- failed to recognize that Plaintiffs had alleged FPD used taxpayer funds to erect large signs on the Estate, at its entrances, indicating already-existing FPD ownership thus inviting public to trespass [A8 fn.7; contra R30p7¶30], which by itself alleges a Taking precluding dismissal;

- ruled the Ordinance did not constitute a taking because it allegedly merely entailed future planning and did not pass any interest in land [A2], while summarily rejecting Plaintiff's assertion that the Ordinance *required* FPD to acquire the property [R60-1p25§1] coupled with the *impending auction* and enforcement mechanism (condemnation) [R60-1p29§3];

- summarily rejected allegations that the effect of the Ordinance *in context of FPD's other acts* caused substantial interference with Plaintiffs' reasonable investment-based expectations of likely financial arrangements with the lender sufficient to allege a Taking [A8];

- found that FPD acted solely in a "proprietary capacity" regarding all the above acts [A10], while <u>expressly</u> choosing to ignore how FPD's uniquely governmental acts manipulated and influenced the foreclosure process far beyond what any private party could accomplish so as to prevent any fair-market foreclosure auction or just compensation to Plaintiffs; [A11 fn.8]

- failed to accept Plaintiffs' allegations of reliance on McGinley's, Keldermans' and FPD's separate and distinct fraudulent misrepresentations and resultant damages [A14-15]; and,

- found that Plaintiffs' damages "arise from their own actions in failing to pay their mortgage and not from the alleged concealment of the fact that FPD was purchasing the mortgage" [A15¶2], while summarily rejecting Plaintiffs' allegations that (despite earlier failures to pay) loss of the property through foreclosure would have been avoided but for the wrongful acts of Defendants which prevented Plaintiffs from opposing FPD's purchase of the Note and which prevented Harris from accepting the same amount Plaintiffs offered in settlement.

6

Plaintiffs contend that the District Court's improper fact findings and rulings constitute denial of due process and, accordingly, the District Court erred when it dismissed all of Plaintiffs' claims; [A2¶2] that the District Court erred when it dismissed Plaintiffs' several Takings claims under Rule 12(b)(6); that the District Court exercised supplemental jurisdiction over the fraud claims [A12 fn.10] and erred by dismissing those claims under Rule 12(b)(6); and that the District Court then erred in ruling that the conspiracy and aiding and abetting claims must fail and be dismissed as there were no underlying Takings or fraud claims. [A11§C; A15]

Plaintiffs believe the importance of preventing such government behavior from setting precedent is clear. The president of Cook County has already publicly announced its intention to similarly utilize such "creative financing" methods to take title to more properties in the future. [R60:10 ¶38] If FPD's methods of coercively taking property while skirting and avoiding Constitutionally mandated compliance with laws of Eminent Domain are allowed to stand, it will open the floodgates to doubtless many other local government entities who will adopt these practices in an effort to take the private properties of other citizens without just compensation.

### Detailed Procedural Background

In 2006, the Cannons, through two wholly owned LLCs (collectively "Plaintiffs"), purchased a 400-acre residential equine estate formerly known as Horizon Farm (the "Estate"), where they intended to build their dream home and retire. To fund the purchase, the Cannons liquidated and mortgaged their retirement accounts and other assets for the down payment, and secured a $14,500,000 loan from Amcore Bank, N.A. [R60p4¶18]  The Estate was appraised then at $20 Million.

With a seller-required short deadline for closing on December 21, 2006, and contrary to Amcore's promise of a long-term mortgage, Amcore prepared the Note as a one-year bridge note

with a promise to modify it within that year to provide a long-term payment schedule. Over five hundred pages of loan documents were withheld by Amcore until late the night before closing and, faced with forfeiture of their multi-million-dollar down payment if they did not close that next morning, Plaintiffs signed the loan documents under duress.

In 2007, just one year after the original purchase, the Estate appraised ($9 Million higher) at $29 Million. However, Amcore was in financial distress. Although Plaintiffs were current on their payments, Amcore refused to modify the Note to a long term payment schedule as promised, and called the loan due and payable demanding immediate repayment in full. When Plaintiffs were unable to pay off the Note on such short notice, Amcore filed foreclosure proceedings in 2009[4] and Plaintiffs defended based in part upon Amcore's breach of its commitment to term out the loan.

Later that year, Amcore failed for "unsound banking practices" and was placed in receivership by FDIC, which seized Amcore's assets including the Note secured by the residential Estate. FDIC then entered an agreement with Harris, under which Harris acquired Amcore's loan assets (including the Note) at a substantial reduction of face value, along with FDIC's government guarantee of any loan Harris could not recover from the borrowers. Harris thus took ownership of the Note, and in 2010 substituted as plaintiff in the foreclosure action.

By 2010, the Estate value had temporarily weakened during the real estate market downturn. In 2012, Harris, Bayview Loan Servicing, and FDIC, contemplated selling the Note to FPD, which was interested in acquiring the Estate.

On February 4, 2013, Harris, Bayview, and FDIC agreed to a behind-closed-doors deal

---

[4] Foreclosure suit proceeded in the Circuit Court of Cook County, County Dept., Chancery Division, No. 09 CH 18291. Plaintiffs/Appellants herein ask this Court to take judicial notice of dates and contents of the public record filings therein.

with FPD, memorialized in a Loan Sale Agreement. [R60-1pp4-20,54-59; R60-2pp1-12]
Pursuant to its terms, FPD would use taxpayer funds to pay Harris $14 million for Plaintiffs'
Note, contingent on approval by the FPD Board. [R60-1p6§4; R60-1p11§11(e)]   FDIC
participated in negotiation of the deal, which expressly conditioned Harris' right to sell the Note
on FDIC's prior approval of the terms. [R60p10¶41; R60-1p9§8¶2]

FPD did not obtain Board approval to purchase the Note until March 19, 2013   [R60-
1p39; R60-1p31¶2 last sentence], a month and a half after it entered the Loan Sale Agreement.[5]
[R60-11p31; R60-1p39] In the interim, covert agents of the FPD repeatedly approached Plaintiffs
about acquiring the Estate, each time fraudulently misrepresenting and actively concealing FPD's
involvement. They did so because they knew the Cannons did not want their beloved farm
property turned into public forest preserve and would take whatever steps were necessary to
prevent it. [R60-2pp33-34] By terms of the secret Loan Sale Agreement, Harris authorized FPD to
contact Plaintiffs with offers of a deed-in-lieu-of-foreclosure agreement under the terms of a Pre-
Negotiation and Confidentiality Agreement ("PNA") the terms of which were required to be
approved by Harris in advance. [R60-1p8 ¶2]  On February 8, 2013, attorney Keldermans

---

[5] The FPD Board's approval of the Note purchase by this unit of government was specifically for
the purpose of coercively forcing the transfer of ownership of Plaintiffs' land to FPD against
Plaintiffs' wishes, without complying with the procedures of laws of Eminent Domain and just
compensation to the owners. [R60-1p39 "… to discuss … acquisition of real estate property"]
and [R60-1p31¶2 last sentence: "This Honorable Board authorized [the] District to acquire the
Note on March 19, 2013."] FPD itself took the position, in state court litigation with taxpayers,
that the process of purchasing a Note and then forcibly taking ownership of the property through
foreclosure litigation was all one singular and continuous transaction authorized by the forest
preserve Enablement Act [70 ILCS 810/0.01 *et seq.*] as a "purchase" of *land*. The taxpayers
(including Cannons) took a directly contrary position (that the FPD was a *government entity* not
authorized by the Enablement Act to purchase a private Note), which was later totally
misunderstood by the District Court in this case as somehow establishing that the Cannons
"acknowledged" FPD's actions in acquiring the Estate were as a private party. [A10 last line]
That was an inaccurate and improper finding which impacted the District Court's conclusion that
"FPD acted in its proprietary, not sovereign, role throughout the process". [A10¶2]

contacted Plaintiffs' counsel, indicating that his unidentified client's confidential disclosure agreement would first need to be approved by Harris before his client could present an offer to Plaintiffs. [R60-2p23] Shortly thereafter, Harris approved the PNA which falsely identified the "Purchaser" of the Note as the ***non-existent*** "Horizon Farms Loan Acquisition LLC, an Illinois limited liability company to be formed," even though the "Purchaser" was actually the FPD and a government entity may not own or operate as an LLC.  [R60-2:18]

On February 13, 2013, attorney Keldermans asked the Cannons to meet him in his law office the next day to discuss an offer regarding the Estate. [R60-2p20; R60-2p65]  Prior to the meeting in his offices, Keldermans required Plaintiffs to sign the PNA. Keldermans purposely concealed that he was acting for FPD and he purposely concealed FPD's role even when specifically asked by the Cannons, instead calling their attention to the PNA's false identification of the "Purchaser" as "Horizon Farms Loan Acquisition LLC, an Illinois limited liability company to be formed".  Believing that a unit of government cannot own an LLC or operate under such a corporate entity, the Cannons repeatedly asked Keldermans whether this LLC was comprised of one individual or a group of individuals, and Keldermans deceptively responded that it was "not just one individual."  Plaintiffs signed the PNA in reliance upon Keldermans' oral and written false identification of the "Purchaser" and under the erroneous impression that the LLC was a private group of individuals. Plaintiffs were thus induced to and did engage in confidential discussions with Keldermans about their Estate and about the ongoing foreclosure litigation and their related strategies, and Plaintiffs were also induced to refrain from further investigating and seeking to interfere with Board approvals of FPD's proposed use of taxpayer funds to purchase their Note.  Keldermans said that the potential Purchaser had not yet committed to purchasing the Note, but that it would consummate that transaction and forego seeking a

10

deficiency judgment if Plaintiffs would agree to transfer their deed to "Purchaser". Ten days later, Keldermans repeated his false-identification of the Purchaser, and his prior oral offer to Plaintiffs, in a writing which set a March 4, 2013 deadline to accept. [R60-2p67-71]

When that deadline passed without acceptance, former Estate owner Robert McGinley separately contacted Plaintiffs the very next day (March 5, 2013) to schedule a meeting, misrepresenting the true purpose of meeting and without disclosing his relationship with FPD and Keldermans. [R60-2p73; R60-2p75] It was later learned that McGinley was secretly acting on behalf of and for the benefit of FPD and Keldermans in exchange for personal recognition, compensation, and consideration from the FPD, including potential use of the Estate for equine activities, fox-hunting, and receiving title to the owner's residence on the Estate (appraised at over $4 Million). [R60-2p89; R60-2pp92-93] McGinley purposely concealed FPD's role when asked, as McGinley was aware that the Cannons did not want to negotiate with FPD. Instead, at that March 11, 2013 meeting, McGinley falsely told the Cannons that a "group of neighbors" was interested in acquiring and sharing ownership of the Estate, but refused to disclose their names when asked. Assured by McGinley that the purchaser was not the FPD, and in reliance thereon, the Cannons shared information about their currently residing in the prior-owners' house (on the Estate) known as Hunt Ridge, about their foreclosure litigation and settlement strategies, and about what they might be willing to accept in exchange for sharing title. Shortly after this McGinley meeting, Plaintiffs suspiciously received a new offer *from Keldermans* including, for the very first time, a proposal that Plaintiffs could retain title to Hunt Ridge (where they had just told McGinley they were residing) in exchange for deeding over the remainder of the Estate to the falsely-identified and non-existent "Horizon Farms Loan Acquisition LLC". [R60-2p78]

Once the FPD Board approved, behind closed doors on March 19, 2013, the use of over

$14 million in taxpayer funds to purchase the Note, and the FDIC approved (on April 25, 2013) a time extension for FPD to close on the Note purchase [R60-1p45¶8.2], the fraudulent subterfuge misidentification was no longer necessary to prevent Plaintiffs from interfering with required approvals. [R60-1p31; R60-1p39]. Cannons offered to pay Harris the same amount FPD paid for the Note, but Harris rejected their offer due to its agreement with FPD. [R60p20¶52]

On the very next day after FDIC approval (April 26, 2013), Keldermans withdrew his "Purchaser's" offer and notified Plaintiffs that "Purchaser has elected to terminate negotiations referenced in the [PNA]". [R60-2p25] The reason became obvious. Although there was no absolute guaranty that FPD would be the successful bidder at foreclosure sale, FPD intended to and did use its governmental powers to control bidding to assure it would be the *only* bidder – thus assuring its coercive taking of Plaintiffs' property at millions of dollars below fair market value without just compensation to the owners.

On June 27, 2013, with prior assistance and approval of other Defendants, FPD executed and closed on the assignment agreement, under which FPD acquired the Note and mortgage in exchange for $14 million in taxpayer funds. [R60-1pp50-52] FPD substituted as plaintiff in the foreclosure action on July 1, 2013.

Despite the fact that foreclosure litigation was pending since 2009, on August 30, 2013, a mere two months after substituting into the case, the Circuit Court of Cook County gave the Cook County FPD a dismissal of all of Plaintiffs' asserted affirmative defenses and a summary judgment of foreclosure. FPD did not immediately gain title to the residential Estate pursuant to that judgment. *See* 735 ILCS 5/15-1507(a) Rather, a foreclosure judgment calls for judicial sale of the Estate through a fair-market-driven auction open to the general public. Under Illinois law, title may transfer only after "(i) confirmation of the sale, and (ii) payment of the purchase price

12

and any other amounts required to be paid by the purchaser at sale." 735 ILCS 5/15-1509(a).[6]

On September 16, 2013, one month before the foreclosure auction and <u>seven months before FPD acquired title</u>, FPD used its government position to garner media coverage that it had *already* owned the property. See: *Couple battle forest preserve over Barrington Hills estate*, Daily Herald, Sept. 16, 2013, *at* http://www.dailyherald.com/article/20130916/news/709169665/ ("Cook County Forest Preserve spokesman Don Parker said the agency … bought the property to protect it from development."); <u>*Id*</u>. (Parker explained the FPD acted because "[b]y waiting longer to purchase the property, we risked it being developed by another buyer.").

Shortly thereafter, and long before the FPD acquired title, *FPD entered onto and erected large metal signs on Plaintiffs' private residential Estate property*, at its entrances, indicating to the public that it already was part of and owned by the "Forest Preserve District of Cook County" thus inviting the public to enter upon and use Plaintiffs' private residential Estate.[7]

On October 1, 2013, the Board authorized FPD to bid and pay up to $20,449,561 to

---

[6] Confirmation of sale is supposed to include unbiased review of all circumstances of the auction, with a comparison between accepted bid price and fair market value of the property, to identify any unconscionability, fraud or injustice. 735 ILCS 5/15-1508(b) Neither occurred in this case, with the Cook County judge just rubber-stamping approval of Cook County FPD's artificially low winning bid on May 5, 2014, and granting a $6 Million deficiency judgment against Plaintiffs.

[7] Having just garnered significant media publicity that FPD already owned the property, FPD's erecting large metal signs on the property near its entrances indicating that the property already was owned and part of the Forest Preserve District was a further invitation to the public to enter upon and use Plaintiff's privately-owned Estate. Thereafter, and long before FPD acquired title, strangers were repeatedly encountered hiking, bicycling, exercising dogs, and riding horses on the Estate: exposing Plaintiffs to potential liability and increased insurance costs; causing disturbance, excitement and potential harm to pregnant mares with foals and weanlings in their turnouts (from unleashed dogs which can excite and frighten horses, and from the public trying to interact with the immature horses and weanlings); interference with quiet enjoyment of the private Estate property (with members of the public defiantly refusing to depart from this "public" property); and causing significant instances of vandalism and damage to multiple buildings and roads on the Estate. FPD's own police made frequent visits to the Estate, driving through its internal roadways and intimidating Plaintiffs' employees and invitees. These details will be fully presented at trial.

purchase the Estate at the upcoming foreclosure auction being held in just two weeks. [R60-1p31]

Simultaneously, despite not owning title to the Estate, the Board enacted an Ordinance converting

the Estate into a public forest preserve, *requiring* FPD to acquire the Estate, by condemnation if

other means of acquisition were unsuccessful. [R60-1p24] The Ordinance was not a mere

prospective enactment for some potential property acquisition at some unidentified future date,

but in context is a simultaneous pronouncement of necessity and absolute intent to acquire the

residential Estate at the already-scheduled foreclosure auction in just two weeks (over which the

FPD had control) [R60-1p25§1 "… it is necessary and desirable for the District to own and it shall

acquire property hereafter described…"]), along with authorization to "condemn" the property if

the FPD is not the successful bidder at auction. [R60-1p29§3 "…it being the intention of said

Board of Commissioners or the District to … negotiate for purchases, condemn or otherwise

acquire … the several parcels of land described …"]  By converting the Estate into forest

preserve, the Ordinance granted FPD expansive regulatory power to e.g. "control the speed of

travel on all paths, driveways and roadways," "exclude therefrom traffic, teams and vehicles,"

"regulate, control and license all modes of travel," and "appoint and maintain a … police force."

*See* 70 ILCS 810/11-15. The Ordinance changed the nature and use of the Estate and constituted

a regulatory taking in violation of the laws of Eminent Domain and the Fifth Amendment.

   Further, by publicly announcing it already owned the Estate, by erecting large metal signs

on the property at its entrances that informed the public the Estate was already owned by and a

part of the FPD and available for public access and use (itself a "Taking"), and by enacting the

Ordinance converting the residential Estate into a forest preserve and that FPD *shall* acquire the

Estate by condemnation if the Cannons did not capitulate or if FPD was not the successful

foreclosure bidder (uniquely "governmental" action, a "Taking"), the FPD effectively controlled

the outcome of the already-scheduled foreclosure auction by preventing other interested parties

from bidding. These are not merely proprietary actions through the same legal channels that any

other non-government individual could employ to assert an interest in property.

Due to its government actions, FPD was sole bidder at auction. Despite the fact that real

estate values had already recovered and the Estate was then believed worth over $22 Million,

FPD bid only $14.5 million, which was at least $7.5 million under fair market value, and $6

million less than the $20 Million+ admitted value the Board itself had authorized FPD to pay.

The Cook County court then dismissed all of Plaintiffs' counterclaims, even though FPD was in

default by never answering them for over four years since they were filed.  Thereafter, on May 5,

2014, the Cook County court summarily confirmed the foreclosure sale to FPD of Cook County,

and further, granted a $6 million+ deficiency judgment against Plaintiffs, all while overruling

Plaintiffs' objections and without any attempt to properly conduct a fair market valuation of the

Estate prior to confirming the artificially-limited and unconscionably low bid price.

Although FPD initially prevailed in the foreclosure action, the Illinois Appellate Court on

May 17, 2016 unanimously reversed the lower court's summary judgment of foreclosure and its

dismissal of Plaintiffs' counterclaims. [8]  The effect of the Appellate Order reversing the summary

judgment of foreclosure was to return the parties to the positions they were in prior to judgment,

to wit: ownership and exclusive possession of the Estate was returned to Plaintiffs herein.[9]

---

[8] In so doing, the Illinois Appellate Court stated: "… we hold that the Cannons adequately alleged facts that could support judgment in their favor on theories of economic duress, violation of the Truth in Lending Act, unclean hands and promissory estoppel." [R93-1p8¶3]

[9] *Garley v. Columbia LaGrange Hosp.,* 377 Ill.App.3d 678, 881 N.E.2d 370, 317 Ill.Dec. 202 (1st Dist. 2007); *In re Marriage of Lehr,* 317 Ill.App.3d 853, 859, 251 Ill.Dec. 336, 740 N.E.2d 417 (2000) ("In Illinois, a reversal abrogates the decree and leaves the cause of action as it stood prior to its entry, restoring the parties to their original positions.") Further, the Appellate Court's judgment is final when it is entered (May 17, 2016), not on the date the mandate issues. *PSL Realty v. Granite Inv. Co.*, 86 Ill.2d 291, 304 (1981).

15

However, FPD blatantly ignored the legal effect of that Appellate Court Order and, in arrogant response thereto, shortly after it issued and in total disrespect for that ruling, FPD entered the property with dozens of workers, heavy equipment, vehicles and FPD police cars, who began tearing down literally miles of expensive four-board fencing throughout Plaintiffs' 400-acre private residential equine Estate, destroying paddocks and making them unavailable for use by horses stabled there, while leaving thousands of boards laying around with rusty nails protruding. FPD even went to the extent of using a bobcat to break off the posts at their bases, leaving their lower portions dangerously jutting out at the surface so that removal would be more expensive. FPD had no perceivable purpose for doing the above other than to abuse, harass and intimidate Plaintiffs through self-help, and to try to pressure Plaintiffs into capitulation. When Plaintiffs told FPD to stop tearing down the much-needed equine fences, that Plaintiffs still owned the Estate and that FPD had no right to destroy its improvements, FPD threatened to have its FPD police arrest them if they attempted to interfere with the ongoing destruction.  FPD police have refused to intercede to protect Plaintiffs' private property (on orders from Dennis White, FPD in-house counsel), despite being given copies of the Appellate Order proving Plaintiffs' ownership.

The Appellate Court decision was unanimously affirmed on request for reconsideration, and the Illinois Supreme Court recently denied FPD's petition for leave to appeal. Yet, the FPD has still continued to blatantly ignore the legal effect of the affirmed Appellate Court Order and Supreme Court denial of leave to appeal, and has continued to destroy further miles of fencing, continuing to have its own FPD police threaten Plaintiffs and their employees with arrest if they interfere. The mandate from the Illinois Supreme Court is expected on March 1, 2017, at which time the foreclosure litigation and revived counterclaims will likely proceed on the merits. In the

interim, FPD continues to destroy improvements on the Estate and threaten Plaintiffs and their

farm employees with arrest if they try to interfere to protect their property. Estimated damages to

date exceed Four Hundred Thousand Dollars, increasing daily with the continuing destruction.

All these post-Appellate-Court-Order (after May 16, 2016) acts of destruction occurred

after this Court's May 9, 2016 dismissal of Plaintiffs' Takings claims herein, and hence were not

part of the existing record before the District Court when it entered its judgment. However,

Plaintiffs have moved the District Court for leave to supplement the record with the sworn

declaration of Meryl Squires-Cannon [R93; R93-1] for this Appellate Court's ultimate review

and consideration and for a potential emergency motion to halt the destruction, and upon reversal

and remand, Plaintiffs will seek leave to amend their pleadings to include these latest Takings.

When it became apparent (prior to the Illinois Appellate Court decision) that Plaintiffs

herein were being denied relief before the Cook County Courts, and that their Federal claims also

needed to include FDIC as a co-conspirator (requiring exclusive Federal jurisdiction), the

Cannons renewed filed herein their "Original Complaint for Conspiracy and Fraud" on July 22,

2014.  [R1]  Defendants filed motions to dismiss [R10, R12, R17], which the District Court

granted on February 26, 2015 for failure to adequately plead the fraud and conspiracy claims.

[R40]  The Court dismissed with prejudice claims against the U.S. "to the extent [they] rel[y] on

fraud allegations" as precluded under the Tort Claims Act. [R40p2]  The claims against the

remaining defendants were dismissed without prejudice and with leave to amend, noting that "if

the Cannons decide to replead their fraud claims, they must provide additional specific

allegations with respect to each Defendant."  [R40p9]

Plaintiffs filed an amended complaint, which was superseded by the Second Amended

Complaint ("SAC") on  November 30, 2015. [R60, R60-1, R60-2]  The SAC adds the LLCs as

17

Plaintiffs, Keldermans as Defendant, no longer alleges fraud claims against the U.S., raises two

counts of multiple Takings Clause violations, alleges specific facts to support the separate frauds

by McGinley and by Keldermans and FPD with Harris' approval, and alleges specific facts to

support conspiracy and aiding and abetting the Takings violations and the separate frauds by

McGinley and by Keldermans. [R60] Defendants filed coordinated motions to dismiss [R61,

R62, R64] which the District Court granted, finding that the claims of multiple Takings Clause

violations failed to state a viable cause of action on the basis that the Ordinance "merely entailed

planning for future acquisition of property and did not pass any interest in the land" and that all of

FPD's other acts were "in its proprietary, and not sovereign, capacity". [A2¶2] The District Court

also dismissed Plaintiffs' separate fraud claims, against McGinley and against Keldermans, for

failing to adequately plead reliance and damages. [A2¶2] The District Court then concluded that

its findings of no underlying wrongful conduct required dismissal of the claims for conspiracy and

for aiding and abetting. [A12 line five; A15 last sentence]

## SUMMARY OF THE ARGUMENT

Plaintiffs alleged two separate fraud counts, with detailed allegations of false statements

and concealments made by Robert McGinley (that he wanted to meet Plaintiffs to discuss the

Barrington Area Conservation Trust, then at the meeting he stated that he represented a "group of

neighbors" interested in sharing ownership of the Estate with Plaintiffs, while hiding that he was

actually representing FPD), and separate allegations of false statements and concealments made

by Keldermans (that the prospective Purchaser of the Note was "Horizon Farms Land

Acquisition LLC, an Illinois limited liability company to be formed")[10] Defendants all knew they

---

[10] Judge Allen, in the taxpayer lawsuit, characterized FPD's conduct of concealing its identity
and falsely misleading Plaintiffs into believing it was a private entity as "underhanded".

were representing FPD in the negotiations, and they intentionally deceived Plaintiffs to induce them to disclose their litigation and settlement strategies, and to induce them to refrain from investigating, learning about and opposing FPD Board and FDIC approvals of FPD's plans.

The District Court, which is supposed to take as true Plaintiffs' allegations, erroneously dismissed the fraud counts by failing to regard as true the allegations of  Plaintiffs' actual reliance on the false statements and concealments (by Robert McGinley, and those separately by Keldermans and FPD), and by failing to regard as true the allegations of Plaintiffs' resultant damages from McGinley's disclosures of their confidential litigation and settlement strategies to FPD, and their damages from McGinley's interference with their settlement negotiations.

The District Court also erroneously dismissed the fraud counts by failing to regard as true Plaintiffs' allegations of causation of damages, that but for Defendants' false representations and concealments upon which Plaintiffs relied, Plaintiffs would not have disclosed their confidential litigation and settlement strategies, would have succeeded in opposing FPD Board approval of FPD's Note purchase, and that Harris would have accepted the same amount offered by Plaintiffs in settlement if FPD did not purchase the Note. The District Court erred in instead summarily finding that Plaintiffs caused their own damages by failing to pay their debt.

The District Court erred by failing to recognize, and regard as true, Plaintiffs' allegations that long before FPD ever acquired title to the Estate, FPD erected large metal signs on the property near its entrances informing the public that the Estate was already owned by and a part of the "Forest Preserve District of Cook County", thereby inviting public access and use of the Estate as if it were public property. The District Court further erred in failing to recognize FPD's acts as constituting an Unconstitutional direct Taking precluding dismissal of Plaintiffs' claims.

The District Court also erred by failing to recognize and regard as true Plaintiffs'

allegations that the <u>entire combination</u> of FPD's uniquely *government* acts: in using its

government powers and contacts to garner media publicity for its pronouncements of existing

ownership; using taxpayer funds to erect on the property large metal signs indicating FPD

already owned the Estate; directing its own highly-visible FPD Police cars to repeatedly enter

and patrol throughout the interior of the Estate; enacting an Ordinance announcing that the FPD

*shall* acquire the Estate by condemnation if FPD did not acquire the Estate at foreclosure auction

two weeks later; all had the combined synergistic effect of preventing any fair-market-driven

bidding at the auction and allowing FPD to be the only bidder at $6 Million *below* the Estate's

admitted value in a sham foreclosure auction, cheating Plaintiffs out of their equity, and thus the

foreclosure constituted an Unconstitutional coercive direct Taking without just compensation.

Instead, the District Court erroneously found FPD "acted in its proprietary, and not sovereign,

role throughout the process" [A10¶2], and dismissed Plaintiffs' Takings claims on that basis. In

the context of a Rule 12(b)(6) motion, the District Court's finding and dismissal was in error.

    Interpretation of an Ordinance is a legal question to be determined *de novo* in the

reviewing Court's judgment, without deference to that of the District Court. This Court should

properly interpret the Ordinance **in context with FPD's overall scheme** of subterfuge to

coercively take title without Plaintiffs' agreement and without paying just compensation, along

with Ordinance provisions *requiring* acquisition of the Estate while authorizing enforcement of

that scheme by condemnation, in context with an already-scheduled foreclosure auction which

FPD controlled, as constituting a regulatory Taking. The District Court erred in failing to

properly interpret the Ordinance in its proper context of all circumstances.

    While interpreting the Ordinance *de novo*, this Court should properly interpret the <u>*effect*</u> of

the Ordinance discouraging any other bidders, in context with FPD's scheme of purchasing the

Note for the express purpose of coercively acquiring title without just compensation to the owners, in contrast with the owners' expectations when they invested in the property that the lender would be financially motivated to resolve any difficulties on a reasonable business basis to the exclusion of trying to acquire the property itself, as constituting substantial interference with Plaintiffs' reasonable investment-based expectations and an Unconstitutional Taking.

The District Court further erred in dismissing the conspiracy and aiding and abetting claims based on its erroneous findings of no underlying wrongful acts.

## <u>STANDARDS OF REVIEW</u>

### <u>Statements and Interpretations of Law</u>

Determinations and statements of the law by the district court are reviewed *de novo* for legal error, and the district court's conclusions are reviewed "for signs that the court's application of the law was infected with legal error, i.e., an erroneous general principle about the way the test should be applied." *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 438 (7th Cir. 1990); *see also Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1187–88 (7th Cir. 1989) (district court's erroneous statement of law and further errors of law prevented the court from exerting its sound discretion); *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 696 (5th Cir. 1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982) (district court's application of erroneous legal standard stripped factual determinations and conclusions of their entitlement to deference). In this case, the District Court's application and interpretations of the required standards of pleading, under Rule 12(b)(6) and Rule 9(b) and applicable authorities, were infected with legal error, leading the District Court to improperly make findings of fact contrary to Plaintiffs' allegations. The District Court also misinterpreted and misapplied its own cited authorities and controlling law.

21

This Court should interpret the effect and meaning of the Ordinance pursuant to its own judgment. "Statutory construction is a question of law, and a reviewing court will interpret a statute *pursuant to its own judgment, independent of, and not deferential to, that of the trial court*." *Advincula v. United Blood Services*, 176 Ill.2d 1, 12, 678 N.E.2d 1009, 223 Ill.Dec. 1, 65 USLW 2472, 75 A.L.R.5th 659 (1996)  (emphasis added) Accord: *Slepicka v. Illinois Dept. of Public Health*, 2014 IL 116927, 21 N.E. 368, 372, 386 Ill.Dec. 605, 609 (2014) ("Because resolution of this issue presents a question of law involving statutory construction, our review is *de novo*."); *Hadley v. Illinois Dept. of Corrections*, 224 Ill.2d 365, 370, 864 N.E.2d 162, 165, 309 Ill.Dec. 296, 299 (2007) ("On this issue of law our review also proceeds *de novo*."); *Ohle v. Neiman Marcus Group*, 2016 IL App. (1st) 141994, 65 N.E.3d 850, 858, 408 Ill.Dec. 374 (2016) ("Statutory construction is a question of law, subject to *de novo* review.")

Further, "In determining the meaning of a statute, a court will not read language in isolation, but must consider it in context of the entire statute." Accord: *Slepicka, supra*  at 373. "In addition, a court may consider *the reason for the law*, the problems sought to be remedied, *the purposes to be achieved*, and the consequences of construing the statute one way or another. [citations omitted]" Id. As stated in *Roberts v. Sea-Land Services, Inc.*, 566 U.S. 93, 101, 132 S.Ct. 1350, 1356, 182 L.Ed.2d 341 (2012): "Statutory language, however, "cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a *statute must be read in their context and with a view to their place in the overall statutory scheme*."

In *King v. Burwell*, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015), the Court stated:

 "… oftentimes the "meaning - or ambiguity - of certain words or phrases may only become evident when placed in context." *Brown* & *Williamson,* 529 U.S., at 132, 120 S.Ct. 1291. So when deciding whether the language is plain, we must read the words "in their context and with a view to their place in the overall statutory scheme." *Id,* at 133, 120 S.Ct. 1291."

FPD's overall statutory scheme was to coercively acquire the Estate without just compensation.

I.     <u>**ARGUMENT**</u>

Defendants moved for, and the District Court granted, dismissal of all counts alleged in the SAC pursuant to Rule 12(b)(6). [R61; R62; R64; A17] In so doing, the District Court erred in its interpretation and application of the law under established precedents. [A-1 through A-16]

A.     <u>**Legal Standard for Rule 12(b)(6) Motions to Dismiss**</u>

A 12(B)(6) motion to dismiss challenges the sufficiency of the complaint, not its merits. Fed.R.Civ.P. 12(b)(6); *Gibson v. City of* Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).  To survive a 12(b)(6) motion, Plaintiffs need only provide "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  The court must "accept all the factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff." *Arazie v. Mullane*, 2 F.3d 1456, 1465 (7th Cir. 1993).

The District Court accurately noted the established legal standard to apply in evaluating Rule 12(b)(6) motions to dismiss, as far as it went. [A5] However, it failed to note and apply the Supreme Court's guidance that a complaint should not be dismissed "unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). See also: *In re Complaint of Holly Marine Towing*, 2002 WL 31415758 (N.D.Ill. 2002).

Further clarification is reflected in the dissent in *Ashcroft v. Iqbal,* 556 U.S. 662, ---, 129

S.Ct. 1937, 1949, 1959, 173 L.Ed.2d 868 (2009):

> "*Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be. See *Twombly,* 550 U.S., at 555, 127 S.Ct. 1955 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *Id.*, at 556, 127 S.Ct. 1955 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable"); see also *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("**Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations").** The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel. That is not what we have here."

Despite Plaintiffs alleging sufficient facts to provide notice of the claims and grounds, repeatedly going beyond allegations to supplement and support with specific references to case authorities [R60] and exhibits [R60-1; R60-2], the District Court nevertheless made multiple erroneous findings in context of Rule 12(b)(6) motions, as well as erroneous interpretations of law.

B. **Counts I and II: The SAC Plausibly Alleges That the FPD Violated the Takings Clause of the Fifth Amendment, As Applied to States Through the Fourteenth Amendment**

The Takings Clause of the Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation", and is applicable against the states and their subdivisions through the Fourteenth Amendment. U.S. CONST. amend.V and XIV. Although "the takings clause does not forbid takings; it requires compensation [to the owners] for takings."[11]

*Rose Acre Farms, Inc. v. Madigan*, 956 F.2d 670, 673 (7th Cir. 1992). Two *types* of multiple Takings Clause violations were alleged: direct Takings and regulatory Takings.

---

[11] Plaintiffs' claims for Takings violations seek only damages [R60p9-10], despite District Court apparent animus toward this suit with inaccurate dicta "In their latest attempt to contest the foreclosure of their property…" [A1], and "Meryl Squires Cannon is also pursuing a separate lawsuit against the FPD and additional defendants, alleging, among other things, that the FPD violated her freedom of movement …" [A1,fn.1] [sic - FPD had its own FPD police arrest, handcuff, search, fingerprint and photograph her, then FPD unsuccessfully prosecuted her for criminal trespass, when she was only on the Estate caring for a tenant's horses as she had done every day for months with FPD's knowledge and consent]. FPD's egregious behavior shows the lengths it will go to encourage capitulation and take Plaintiffs' Estate.

1. **DIRECT TAKINGS**

"[P]ermanent physical occupation of another's property" is "perhaps the most serious

form of invasion of an owner's property interests" and is unquestionably a taking under the Fifth

Amendment. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). The

Supreme Court has required compensation in these cases, "no matter how minute the intrusion,

and no matter how weighty the public purpose behind it." *Lucas v. South Carolina Coastal

Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886 (1992).

As stated in *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S.

302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002):

> "When the government physically takes possession of an interest in property for some
> public purpose, it has a categorical duty to compensate the former owner, *United States v.
> Pewee Coal Co.,* 341 U.S. 114, 115, 71 S.Ct. 670, 95 L.Ed. 809 (1951), regardless of
> whether the interest that is taken constitutes an entire parcel or merely a part thereof.
> Thus, compensation is mandated when a leasehold is taken and the government occupies
> the property for its own purposes, even though that use is temporary. *United States v.
> General Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945); *United States v.
> Petty Motor Co.,* 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946). Similarly, when the
> government appropriates part of a rooftop in order to provide cable TV access for
> apartment tenants, *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102
> S.Ct. 3164, 73 L.Ed.2d 868 (1982); or when its planes use private airspace to approach a
> government airport, *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206
> (1946), it is required to pay for that share no matter how small.

a) **Erecting Large Signs on Private Estate Inviting Public Access and Use**

The SAC clearly alleged: "… ***despite its not then owning title*** to the Estate … FPD even

erected signs at the Estate entrances announcing to the public that it was FPD property."[12]

[R60p7¶30] (emphasis in original) The import of such signage was to invite the public to access

and use Plaintiffs' private Estate, especially after FPD used its government influence and press

_____

[12] Plaintiffs' extensive damages caused thereby would have been presented fully at trial, and
would include without limitation at least those described in detail in footnote 7 above.

releases to garner media publicity about its claims to already own the property. Despite that

quoted allegation, the District Court apparently overlooked its existence in the SAC. [A8, fn.7:

"… these allegations are not included in the second amended complaint …"] The District Court

noted Plaintiffs did argue it in their opposition to the 12(b)(6) motions, but then summarily

negated it, stating:

> "But even accepting that the FPD erected signs on the property at some point prior to
> taking title, … this does not change the Court's analysis of whether the ordinance at issue
> amounts to a regulatory taking." [A8, fn.7]

Setting aside the Court inappropriately negating its effect on analysis of the Ordinance, the

District Court erred in failing to independently recognize Plaintiffs' allegation as sufficient to

state a plausible claim for direct Takings Clause violation precluding dismissal.

Plaintiffs demanded a jury trial. Pursuant to Fed.R.Civ.P 71.1(h). Plaintiffs are entitled to

a jury's determination of "just compensation" for Defendants' Takings.  *See* Fed.R.Civ.P.

71.1(h)(1)(A) (just compensation "must be determined by a jury when a party demands one").

### b) Coercively Taking Ownership Through Government-Manipulated Subterfuge of Sham Foreclosure

Count II of the SAC [R60p9¶¶36-38], which incorporates by reference all allegations that

preceded it [R60p9¶35], alleges that the entire combination of FPD's *government* acts, leading

up to and including the sham foreclosure auction, effected an Unconstitutional direct Taking of

the Estate without just compensation to the owners. The District Court erroneously found that

FPD "acted in its proprietary, and not sovereign, role throughout the process" [A10¶2], and

dismissed Plaintiffs' direct Takings claims on that basis. In the context of a Rule 12(b)(6)

motion, the District Court's finding was in error.

The District Court's ruling turns partially on a misinterpretation of the FPD's Enablement

Act [70 ILCS 810/0.01 *et seq.*] in the context of the law of Eminent Domain. While Plaintiffs

26

believe the Cook County court ruled incorrectly[13] that the Enablement Act (which creates the

FPD and grants it powers limited to those expressly stated) was not violated by FPD's procedure

of purchasing the Note and coercive taking through foreclosure [A10¶1], that does not mean

FPD's actions met the requirements of just compensation mandated by the Takings Clause.

> "[A state] legislature may prescribe a form of procedure to be observed in the taking of
> private property for public use, but it is not due process of law if provision is not made
> for *just compensation to the owners of the property*." *Chicago, B.&Q. R. Co. v. City of
> Chicago,* 166 U.S. 226, 236 (1897). (emphasis added) "Once a property right is created, a
> state may not authorize the deprivation of that right without appropriate procedural
> safeguards." *Scott v. O'Grady,* 760 F.Supp. 1288, 1297 (N.D. IL 1991); citing *Cleveland
> Bd. of Ed. v. Loudermill,* 470 U.S. 532, 541 (1985); *Davis Oil Co. v. Mills,* 873 F.2d 774,
> 783 (5th Cir. 1989). **The amount of fair compensation is to be determined by a jury.**
> Fed. R. Civ. P. 71.1(h)(1)(A) ("compensation must be determined . . . by a jury when a
> party demands one"); 735 ILCS 30/10-5-5.

It would be contrary to the laws of Eminent Domain, and protections afforded by the mandatory

compensation requirements of the Takings Clause, for a local enablement statute to defeat those

Constitutional protections and permit a government entity to coercively take private property

without ensuring just compensation to the owners for fair market value as determined by a jury.

> "This court, referring to the fourteenth amendment, has said: 'Can a state make anything due
> process of law which, by its own legislation, it chooses to declare such? To affirm this is to
> hold that the prohibition to the states is of no avail, or has no application, where the invasion
> of private rights is effected under the forms of state legislation.' <u>Davidson v. New Orleans,
> 96 U. S. 97, 102.</u>" *Chicago, B.&Q. R. Co. v. City of Chicago,* 166 U.S. 226, 234 (1897).

The District Court misapplied the authorities it cited in support of its erroneous finding that FPD

"acted in its proprietary, and not sovereign, role throughout the [foreclosure] process". [A10¶2]

Each of the authorities cited in the Court's Opinion [A10-A11] contemplated just compensation

to the  owners (determined either by the owners' voluntary agreement or by jury determinations

---

[13] The ruling was rendered in a separate lawsuit filed by Cook County taxpayers, and later upheld
on appeal. *Baker v. Forest Preserve District of Cook County,* 2015 IL App (1st) 141157, 393 Ill.Dec. 1,
33 N.E.3d 745, 754-756 (the "taxpayer suit").

of fair market value upon condemnation) or a value determined by free market forces at a public foreclosure sale **unimpeded by government interference** <u>where the owners had contracted directly with the government entity to allow its foreclosure</u>. Due to FPD's *government actions*, neither occurred.

Plaintiffs entered into their contractual agreements (Note and mortgage) with a *private* entity whose sole motivations for requiring a mortgage (and any subsequent negotiations) were financial recovery of its loan, secure in the understanding that any *government* taking of their property would require condemnation and a jury determination of fair market value for just compensation. Plaintiff did *not* enter into any agreement with a government entity whose motivations for foreclosure weren't limited to financial recovery, and which could use its government powers and resources to *prevent* a fair and open foreclosure auction. Knowing the Cannons would not agree to FPD acquiring their property, FPD purchased their Note and mortgage from their private lender (Harris). Hence, Plaintiffs did not voluntarily agree to waive their protections under the Takings Clause by allowing the *government* to foreclose on their mortgage.

Even if the Note and mortgage allowing Harris to assign them could somehow be interpreted as Plaintiffs knowingly agreeing to waive their Takings Clause protections and procedural requirements and instead allowing *government* foreclosure, which Plaintiffs deny, Plaintiffs have alleged that FPD's inherently governmental acts so manipulated and interfered with the normal foreclosure process as to render it a sham that did not fairly reflect the real value of the property it seized.

FPD did so by: using its government status, political powers and influence to garner media publicity of its public proclamations that it already owned the Estate; using taxpayer funds

28

to erect large metal signs on the Estate near its entrances indicating that the Estate was already owned by and part of the Forest Preserve District of Cook County, subject to all of its regulations and restrictions; repeatedly entering and patrolling the interior of the Estate with its highly-visible "FPD Police" vehicles to enforce thereon FPD's instructions, regulations and restrictions; enacting an Ordinance publicly announcing that FPD *shall* acquire the Estate [R60-1p25§1], with conversion of the Estate into forest preserve subject to all of its regulations and restrictions [R60-1p25§1], by condemnation if not successful acquiring the Estate at the foreclosure auction just two weeks away[14] [R60-1p29§3]; simultaneously approving and adopting the FPD's "Proposed Land Acquisition" [R60-1p35 last line]; and, publicly announcing its simultaneous authorization to bid up to the full amount of the judgment for $20,449,561.08. [R60-1p31¶2]

Any qualified prospective bidder, before participating in a multi-million-dollar auction, would conduct due diligence, investigate and learn of the above, and thus be dissuaded from bidding against FPD knowing of its Ordinance commitment that it *shall* acquire the Estate through condemnation if it doesn't acquire the Estate by other means. The FPD Board's coordinated simultaneous enactment and approval of the Ordinance and adoption motions (peculiarly governmental functions), in conjunction and coordination with the FPD's own controlled scheduling of a coercive foreclosure sale, manipulated by FPD's use of government status and taxpayer assets to garner publicity about its already-existing ownership and erecting signs on the property indicating it was already owned by the FPD, was *far more* than just acting in a proprietary capacity the same as any other potential purchaser

---

[14] Since a foreclosure auction was already scheduled to occur within less than two weeks, the only purpose for FPD including the condemnation provision was to publicly announce the threat of condemnation to preclude competitive bids. That was *not* a "legitimate public purpose" for the condemnation provision being included in the ordinance.

could do "through the same legal channels that any other individual would employ to assert

such an interest", as required by *Klump v. U.S.*, 50 Fed.Cl. 268, 271 (Fed. Cl. 2001).

FPD's referenced *government* acts caused FPD to be the only bidder at the foreclosure

auction, at a price $6 Million below its own admitted value of $20,449,561.08. **<u>No private</u>**

**<u>purchaser had the power to exact such leverage and control against all other potential</u>**

**<u>bidders at a foreclosure sale</u>** – and the FPD was only able to do so by legislatively threatening

use of its ***governmental*** power of condemnation. FPD's threats of condemnation in coordinated

combination with its control over the coercive foreclosure sale constituted government action

taken in its *sovereign* capacity, and an Unconstitutional government Taking without just

compensation.

In context of a Rule 12(b)(6) motion, the District Court application of its cited authorities

and finding that FPD "acted in its proprietary, and not sovereign, role throughout the process",

were in error. The District Court's dismissal of direct Takings claims should be reversed.

### c) <u>Entering the Estate and Tearing Down Miles of Expensive Permanent Improvement Equine Fencing</u>

Plaintiffs respectfully ask this Honorable Court to review and consider FPD's egregious

acts of destroying literally miles of expensive four-board-and-posts fencing on the Estate, <u>*after*</u>

the Illinois Appellate Court Order had reversed the foreclosure court's judgment thereby

returning ownership and exclusive possession to Plaintiffs, as further direct Takings Clause

violations justifying reversal and remand. Although these acts occurred subsequent to and hence

were not part of the District Court's judgment herein, Plaintiffs have moved the District Court

for leave to supplement the record with the sworn *Supplemental Declaration of Meryl Squires-*

*Cannon Regarding Post Judgment Acts of Destruction* [R93; R93-1] so this Court may properly

consider them as direct Takings Clause violations which justify reversal and remand.

## 2. **REGULATORY TAKINGS**

The SAC sets forth a plausible regulatory Takings Clause claim. [R60p6-9¶¶27-34]  The FPD's October 1, 2013 enactment of an Ordinance, when properly interpreted in the context of FPD's overall scheme and coordinated actions, *fait accompli* converted the Estate into a public forest preserve while Plaintiffs still owned title to the Estate, which substantially interfered with Plaintiffs' use and quiet enjoyment of their private Estate, their reasonable investment-based expectations, and precluded a neutral fair-market-driven bidding process at the foreclosure sale. The Ordinance thus constituted a government regulatory Taking without just compensation, in violation of the Fifth Amendment to the Constitution.

Courts use a three-factor analysis to assess whether a given regulation "go[es] 'too far' for purposes of the Fifth Amendment." *Horne v. Dep't of Agric.*, --- U.S. ----, 135 S. Ct. 2419, 2427, 192 L. Ed.  2d 388 (2015) (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 67 L. Ed. 322 (1922)); *see also  Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1014-15 (1992).  That analysis considers "(1) the nature of the government regulatory scheme, (2) the severity of the economic impact on the  challenging landowner, and (3) the degree of interference with the landowner's anticipated and distinct investment opportunities." *Bettendorf v. St. Croix Cty.*, 631 F.3d 421, 424 (7th Cir.  2011). Each of these factors is fact dependent, making it error for the District Court to dismiss the regulatory Takings claim under Rule 12(b)(6), particularly where Plaintiffs demanded a jury trial of all factual issues.

Further, even if the factual issues were not in dispute, construction of the Ordinance is a question of law upon which this Court will rule "***pursuant to its own judgment, independent of, and not deferential to, that of the trial court***" [*Advincula, supra* at 12], and in context and with a view toward FPD's overall scheme. *Roberts v. Sea-Land Services, Inc.*, *supra* at 101. In this case, FPD's overall statutory scheme was to coercively acquire the Estate

property from Plaintiffs without paying just compensation to them. The District Court erred in its interpretation of the Ordinance and its effect in context of all existing circumstances.

All three factors weigh in favor of finding a "taking" without just compensation.

First, the nature and timing of the regulation indicates that the Ordinance imposed an unfairly onerous burden on Plaintiffs. The Ordinance, which purports to serve a public purpose by converting the Estate into a public forest preserve, concentrates its burdens on the small group of Plaintiffs who owned the Estate, shortly before the foreclosure sale, triggering the "fairness" and "justice" concerns underlying the Takings doctrine. *See Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); *see also Walcek v. United States*, 49 Fed. Cl. 248, 271 (2001) (analyzing the nature of the regulation by examining whether it targets a small number of owners or is more general in application), *aff'd*, 303 F.3d 1349 (Fed. Cir. 2002).

Second, the SAC alleged a severe negative economic impact resulting from the prematurely issued Ordinance, related publicity, and the signage FPD posted at entrances to the Estate while Plaintiffs still held title. FPD, by deeming the Estate a "forest preserve" and stating that FPD *shall* acquire the Estate, combined with the already-scheduled foreclosure auction just two weeks later and the authorized enforcement mechanism of condemnation, along with daily intrusion of FPD Police vehicles patrolling the interior of the property, *fait accompli* converted the Estate into forest preserve and asserted expansive regulatory powers over the use of the Estate. [R60p7¶32] FPD's authorizing daily intrusions by the FPD Police vehicles patrolling throughout the Estate and stopping and intimidating Plaintiffs' staff and employees and invitees are strong

indications that FPD itself interpreted the Ordinance as already giving it those powers.[15]

Moreover, by publicly labeling the Estate a "forest preserve" before it held title, FPD conveyed

to the public that it already had those expansive regulatory powers. The Ordinance encouraged

public access and use of the private Estate, and deterred other interested parties from bidding at

the scheduled auction that FPD controlled. That allowed FPD to win with a bid $6 million less

than the Board itself valued the property. The immediate economic impact of the Ordinance on

the auction bidding is also reflected in the comparative value of adjacent properties. When FPD

took title to the Estate in May 2014, it also purchased 24 acres of directly adjoining land

[R60-2p27], at a price per acre which, applied to the Estate, supports a valuation of $35.8 Million

and demonstrates that FPD drastically underpaid for the Estate in the sham foreclosure.

Third, Plaintiffs have alleged a significant degree of interference with their reasonable

investment-based expectations, as the legal intrusions resulting from the Ordinance completely

foreclosed Plaintiffs' ability to exert any control over the public's use of their private Estate.

When the Ordinance was enacted, and long before FPD ever took title, members of the public

came onto the Estate and refused to leave, and the FPD police "patrolling" the Estate would not

prevent them from doing so. Moreover, numerous restrictions imposed by the Ordinance, along

with FPD's other synergistic government acts, combined to make it a *fait accompli* conversion

of the Estate into forest preserve owned by FPD, which amounts to far more than mere "planning

of a possible future taking" and constituted regulatory Taking precluding dismissal.

---

[15] *See: Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997): "Because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless " 'plainly erroneous or inconsistent with the regulation.' " *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359, 109 S.Ct. 1835, 1850, 104 L.Ed.2d 351 (1989) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945))."

The Supreme Court has focused on whether the plaintiff's investment-backed expectations are reasonable and therefore protected by the Takings Clause. *See Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994) ("settled expectations should not be lightly disrupted"); *Goodpaster v. City of Indiannapolis*, 736 F.3d 1060, 1074 (7th Cir. 2013) (examining "the degree of interference with the owner's reasonable investment-based expectations"). Here, Plaintiffs expected to have quiet enjoyment of their residential Estate, free from incursions by FPD police and the public resulting from FPD's Ordinance and related ownership claims and publicity. Plaintiffs had no reason to anticipate that FPD would purchase their Note *and then enact an Ordinance to prevent a competitive bidding at a fair-market-driven foreclosure auction* instead of complying with Eminent Domain procedures and paying just compensation, nor did they anticipate that the FPD Board would approve of a scheme whereby their property would be coercively taken by the government and turned into a public forest preserve without just compensation to them. In fact, Keldermans and McGinley purposely misrepresented to them that only *private parties* were interested in acquiring the Estate. Contrast Plaintiffs' fact situation from the authority upon which the District Court relied, *City of Chicago v. Loitz,* 329 N.E.2d 208, 211, 61 Ill.2d 92 (1975) (finding insignificant interference with reasonable investment-based expectations because "[t]he fact that at some future time a municipal corporation, with power of eminent domain, may require the land of a private owner, is one of the conditions on which the owner holds land in this State.") [A9] Under *Loitz,* the owner was assured of a jury determination of just compensation through condemnation proceedings, in contrast to what happened to Plaintiffs herein.

All three factors in context weighing in favor of finding a regulatory Taking, it was error for the District Court to dismiss Plaintiffs' claim therefor.

34

**C. Count IV: Contrary to the District Court's Improper Finding, the SAC Adequately Alleges That Plaintiffs Relied Upon Keldermans' Fraudulent Misrepresentations and Omissions and that Plaintiffs Suffered Damages Therefrom**

To state a claim for fraud, Plaintiffs must allege: (1) Defendant made a false statement or omission of material fact; (2) Defendant had knowledge or belief that the statement was false or that the omission was misleading; (3) Defendant intended to induce Plaintiff to act or refrain from acting; (4) Plaintiffs acted or refrained from acting in reliance on Defendant's statement or omission; and (5) damage to Plaintiffs resulting from such reliance. *Weidner v. Karlin*, 402 Ill. App. 3d 1084, 1087, 932 N.E.2d 602, 605 (3d Dist. 2010). Additionally, to the extent Plaintiffs claim fraudulent concealment, they must allege Defendant had a duty to disclose the omitted facts to them. *Id.*; *see also Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir. 2013). [A13]

Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud". Fed.R.Civ.P. 9(b) This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615, 2011 WL 3629726 (7th Cir. 2011). *See also: Arazie v. Mullane*, 2 F.3d 1456, 1465, 26 Fed.R.Serv.3d 873 (7th Cir. 1993);

Plaintiffs have satisfied these requirements in alleging with specificity that Keldermans committed fraudulent misrepresentations and concealments. The SAC alleges that on February 14, 2013, Keldermans, the FPD's lawyer, arranged for a meeting with Plaintiffs at his law office, where he falsely stated, both in writing (in the PNA) and verbally, that private individuals operating under "Horizon Farms Loan Acquisition LLC" sought to negotiate a deal to acquire the Estate. [R60p17¶48; R60-2p23 and p65] Keldermans, an attorney, and the FPD knew that statement was false because the FPD was the real proposed "Purchaser" and because a government entity like the FPD could not operate as an LLC. [R60p17-18¶¶48-49] Keldermans

35

repeated his misrepresentations and concealments during further contacts with Plaintiffs, to induce them to negotiate and make disclosures of their litigation and settlement strategies to him[16], and also to induce them to refrain from learning about and interfering with required FPD Board and FDIC approvals [R60p19¶50], because Keldermans knew from prior indirect contacts that Plaintiffs were not willing to negotiate with the FPD, did not want their Estate converted to forest preserve **and would oppose any efforts to do so**. [R60p18¶49; R60-2pp33-34]

Plaintiffs also sufficiently alleged facts in support of a claim for fraudulent concealment. Keldermans knew that, under the circumstances of his affirmative statements falsely identifying the Purchaser in the PNA and in light of Plaintiffs' requests about the identity of the Purchaser, his written and oral statements and concealments were false and misleading. Under those circumstances, Keldermans had a **duty to disclose** the truth.[17] [R60p18¶49 and fn.3]  Further, under Illinois law, "a duty to disclose material facts may arise out of a situation where the plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff.  This position of superiority may arise by reason of

---

[16] "The identity of this "Purchaser" was material to Plaintiffs in determining whether they might be willing to negotiate a deal with that party, and whether disclosure of their related private information to that party might expose them to further difficulties in their ongoing litigation if no deal was reached." [R60¶48]

[17] "While silence in a business transaction does not generally amount to fraud, mere silence is quite different from concealment. Silence accompanied by deceptive conduct or suppression of material facts results in *active concealment* and it then becomes the duty of a person to speak. Under such circumstances, if a party to a contract of sale fails to disclose the whole truth, having the requisite intent to deceive, this amounts to fraud, equivalent to an affirmative falsehood. *Russow v. Bobola* (1972), 2 Ill.App.3d 837, 277 N.E.2d 769." Mitchell v. Skubiak, 248 Ill.App.3d 1000, 1005, 618 N.E.2d 1013, 188 Ill.Dec. 443 (1993). "Upon plaintiffs' inquiring about [the issue of their concern], a duty arose on behalf of the defendants. Their failure to speak, or rather disclose the entire truth of the matter, sufficiently states a cause of action for fraudulent misrepresentation." *Id*. at 1006. Keldermans had a duty to disclose the truth once he made false and misleading identification of the Purchaser as "Horizon Farms Acquisition LLC, an Illinois limited liability company to be formed".

36

friendship, agency, or experience." *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir.

2013) (quoting *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500, 675 N.E.2d 584, 593 (1996)).

Here, Plaintiffs trusted Keldermans, who was in an exclusive position to know the true identity

of the party he represented. Moreover, as an officer of the court, Keldermans is "held to the

standards of behavior required by the Illinois Code of Professional Conduct with its proscriptions

against making dishonest statements." [R60p19¶51]; *see also Russow v. Bobola*, 2 Ill. App. 3d

837, 841, 277 N.E.2d 769, 771 (2d Dist. 1972) ("Silence accompanied by deceptive conduct or

suppression of material facts results in active concealment, and it then becomes the duty of

person to speak."). Keldermans had a duty to disclose the material information he withheld.

### 1. Facts Establishing Plaintiffs' Reliance Were Adequately Alleged

Contrary to the District Court's erroneous finding, Plaintiffs did adequately allege facts

which establish their reliance on Keldermans' false and misleading representations and

concealments. Plaintiffs relied on Keldermans' false and misleading representations and

concealments when they signed the PNA[18] and proceeded to divulge information to Keldermans

about the Estate and ongoing litigation,[19] and when they refrained from further investigating,

---

[18] "Keldermans required the LLCs, and Cannons individually, to sign a *Pre-Negotiation And Confidentiality Agreement* … between Plaintiffs and "Purchaser"… [R60p17¶48]

[19] "… Plaintiffs did sign the PNA and have subsequent confidential discussions with Keldermans about the Estate and ongoing litigation, and Plaintiffs did rely upon Keldermans' false and misleading representations and concealments to their individual detriment and damage - separate and apart from the deal Keldermans proposed." [R60p19¶50] It was error for the District Court to find otherwise. Contrary to the District Court's misinterpretation of the holding in *Reid v. Harvey Motorcycle & Camper*, No. 05 C 5375, 2007 WL 4277435, at *6 (N.D.Ill. 2007) [A15], there is no required fraud element that Plaintiffs have entered into the transaction Keldermans was proposing. Fraud is established if Plaintiffs were intentionally induced to take *other* actions (e.g. disclose confidential information) or were induced to *refrain* from taking other actions (e.g. refrained from investigating and opposing FPD Board approvals), in reliance upon Keldermans' misrepresentations and concealments, causing Plaintiffs harm or damages.

discovering, and opposing FPD's secret plans. Plaintiffs expressly alleged: "Plaintiffs did rely upon Keldermans' false and misleading statements and concealments, which led them to believe the "Purchaser" was a private party …" [R60p19¶51] In the context of a Rule 12(b)(6) motion, it was error for the District Court not to accept as true Plaintiffs' allegations of reliance.

## 2. **Plaintiffs Alleged Facts Establishing Damages From Keldermans' Fraud**

The SAC alleges that, in reliance upon Keldermans' false representations and concealments, Plaintiffs signed the PNA and had subsequent discussions with Keldermans about the Estate and about Plaintiffs' confidential litigation and settlement strategies. [R60p19¶51] Unbeknownst to Plaintiffs, Keldermans was secretly representing FPD, the party which ultimately became their opponent in the pending litigation. Damages therefrom are certain, but can only be quantified once his firm's use of information disclosed by Plaintiffs is ascertained through discovery, since such matters are solely within Keldermans' exclusive possession and his firm became counsel of record in the foreclosure case. The SAC also expressly alleges:

"… Keldermans' false and misleading statements and concealments led them to believe that the "Purchaser" was a private party, *causing them to* refrain from ascertaining the true identity of the FPD in time to address the matter to the FPD Board in opposition of its approving using taxpayer funds for the multi-million dollar Note purchase and involvement in protracted foreclosure litigation, and against their express wishes and steadfast opposition (known to FPD but not the Board) against the Estate becoming forest preserve." [R60p19¶51] (emphasis added)

Once FPD secured the option to purchase the Note, Harris could no longer negotiate any resolution with Plaintiffs, even though they had offered Harris the same amount the FPD paid for the Note. [R60p20¶52] The SAC goes on to further allege its damages as follows:

"Harris, as a bank, was interested in recovery of its money, and did not have such an interest in title to the land as to refuse to accept the same amount from Cannons, or to reject reasonable repayment terms as were promised by Amcore. In contrast, FPD had only one agenda – to hopefully acquire title by foreclosure, and thus FPD refused to negotiate anything short of complete capitulation and immediate payment (of all principle, interest, penalties and legal fees). Likelihood of opposing Board approval of the Note purchase

(risking millions in taxpayer funds and years of protracted litigation)[20], and the amount of damage to Plaintiffs caused by the fraud, are questions of fact for the jury to decide."

The District Court erroneously found, in context of a Rule 12(b)(6) motion, that Plaintiffs have not suffered cognizable damages because the loss of the property was "the result of Plaintiffs' own conduct – non- payment of the debt and taxes." [A15¶2]  That erroneous finding ignores the separate damages Plaintiffs alleged from confidential disclosures of their litigation and settlement strategies to Keldermans, who secretly was representing FPD, their future opponent in the pending litigation being discussed. [A60] That erroneous finding also misunderstands the nature of the further harm Plaintiffs alleged, since Plaintiffs never alleged that Keldermans' fraud caused the Estate to go into foreclosure litigation (arguably precipitated by their failure to pay), but rather that Keldermans' fraud interfered with Plaintiffs' subsequent negotiations and prevented Plaintiffs from *settling* that litigation in order to retain title to the Estate and avoid any deficiency judgment. Quantification of those damages are a question of fact to be tried to a jury, while the existence of those damages has been properly and sufficiently alleged by Plaintiffs.

The District Court erred in failing to accept as true, in the context of Rule 12(b)(6) motions to dismiss, Plaintiffs' allegations of reliance and damages, and in failing to interpret them in a light most favorable to Plaintiffs' claims for the Keldermans frauds.

---

[20] Unbeknownst to Plaintiffs, during its approval process FPD Board members were concerned and inquired about the litigation, but FPD's in house attorney (Dennis White, who orchestrated the Note purchase) deceptively gave a very slanted and incomplete report of the extent of all the litigation and of FPD's exposure, along with inaccurate evaluations and assurances. Plaintiffs would have given a more balanced and complete assessment, and opposed Board approvals, had they been aware of FPD's plans to purchase a Note and inject itself into protracted litigation at taxpayers' expense – litigation which has cost Cook County taxpayers well over $500,000 in legal fees. Had Plaintiffs been able to timely address the Board it is highly likely the Board would have elected not to pursue acquiring the Estate unless and until the pending foreclosure litigation had been finally resolved, and Harris would then have accepted the Cannons' identical offer to avoid further litigation. This was prevented by Keldermans' acts.

D. **Count VI:  The SAC Adequately Alleges That the McGinley Defendants, at the FPD's Request, Fraudulently Misrepresented the Identity of the Potential Purchaser to Plaintiffs**

Plaintiffs have alleged with specificity facts which establish that Robert McGinley committed multiple acts of  fraudulent misrepresentation and concealment. [R60pp24-27¶¶59-65] The SAC alleges that Robert McGinley knowingly made false statements and concealments to Plaintiffs [R60p25¶62], while dishonestly hiding that he had been and was assisting and acting for the benefit of FPD. [R60-2p89; R60-2pp92-93 at dates 6/21, 6/24, 6/27] Robert McGinley made his false statements and dishonest concealments in writing on March 5, 2013 (that he wanted to meet with Plaintiffs to discuss the Barrington Area Conservation Trust ("BACT")) [R60-2p73], and orally at a March 11, 2013 meeting (falsely stating that a "group of neighbors" was interested in acquiring or sharing ownership of the Estate). [R60p25¶60; R60-2pp75-76]

Like Keldermans, McGinley knew his statements and concealments were false, and he intended them to induce Plaintiffs to act (meet with him, negotiate and make confidential disclosures about Plaintiffs' litigation and settlement strategies) and to induce Plaintiffs to refrain from acting (to refrain from investigating, and interfering with and opposing FPD Board approval of, FPD's plans), while under the false belief that a group of private individuals, and not the FPD, were interested.  Plaintiffs relied on McGinley's false statements and concealments and, as a result, Plaintiffs were induced to disclose confidential information to McGinley (which he later shared with FPD) about Plaintiffs' litigation and settlement strategies, including but not limited to their  potential willingness to share title and the fact that Richard Cannon was then occupying Hunt Ridge as his primary residence. Plaintiffs' reliance also induced them to refrain from investigating and timely opposing FPB Board approval of the FPD's plan which prevented Harris from accepting their offer of the same amount FPD would pay. Plaintiffs' above-described acts

40

and refraining from acting, induced by their said reliance of McGinley's frauds, all resulted in certain damages to Plaintiffs (in amounts to be proven to a jury after full discovery), loss of ownership of the Estate, and a $6 Million+ deficiency judgment against them. [R60p26¶64]

Plaintiffs have also sufficiently pled that McGinley had a duty to disclose the truth. [R60p25¶62] McGinley knew that the prospective purchaser's identity was material to Plaintiffs, and yet falsely told them that the prospective purchaser was a "group of neighbors". [Id.] Such a situation gives rise to a duty to disclose the truth. *See Russow*, *supra* at 841; footnote 17 above. And, for the reasons explained above, Plaintiffs' fraud claims do not require consummation of any transaction McGinley proposed.

The District Court erred in failing to accept as true Plaintiffs' allegations of reliance on Robert McGinley's false statements and misleading omissions, and in failing to accept as true Plaintiffs' allegations of damages caused thereby.

E. **Counts III and V:  Claims That Defendants Conspired and Aided and Abetted FPD's Unconstitutional Taking of the Estate and the Keldermans Fraud**[21]

Plaintiffs separately alleged for each Defendnat all of the elements of conspiracy, and aiding and abetting, for FPD' Unconstitutional Takings: FDIC [R60p11,¶41];  FPD,Board, DOES [R60p11¶42]; Harris [R60p12¶43]; Bayview [R60p13¶44]; Keldermans [R60p14¶45]; McGinley,Partners [R60p15¶46]; and for the Keldermans fraud: Harris [R60p21¶55]; Bayview [R60p21¶56]; McGinley,Partners [R60p22¶¶57-58] The District Court correctly noted that a conspiracy claim cannot survive where the plaintiff fails to state an underlying cause of action,

---

[21] Despite having dismissed Plaintiffs' claims for multiple alternative violations of the Takings Clause, which were the basis for original jurisdiction, the District Court retained supplemental jurisdiction over and then similarly dismissed each of the state law fraud claims, as well as the related conspiracy and aiding and abetting claims.

and that aiding and abetting claims likewise require independent underlying wrongful conduct to

be viable. [A11§C] However, for the reasons set forth above, the District Court erred in its

findings that Plaintiff failed to state a claim for FPD's Unconstitutional Taking or for fraud.

Hence, since the District Court's dismissal of each of the conspiracy and aiding and abetting

claims was dependent upon its erroneous findings that "no taking occurred" [A11§C] and that

"there is no underlying fraud claim" [A15¶2], it was error for the District Court to dismiss the

conspiracy and aiding and abetting claims based thereon.

**IV.    <u>CONCLUSION</u>**

For all of the foregoing reasons, Plaintiffs respectfully request  the Court of Appeals to

reverse the May 9, 2016 judgment of the District Court, to reinstate the action and all of the

claims, and to grant such other or further relief to which they may be entitled on this appeal.

Respectfully submitted,

  /s/ Richard Kirk Cannon
Richard Kirk Cannon
Law Offices of Cannon & Associates
117 S. Cook St., #361
Barrington, IL  60010-4311
TEL:  (847) 381-1600
FAX: (847) 381-6650
EMAIL: rkcannon@cannoniplaw.com

*Attorneys for Plaintiffs/Appellants, and pro se*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 14,000 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 12 point font in Times New Roman style font.

Dated:  February 24, 2017

*/s/  Richard K. Cannon*_____
Richard K. Cannon
**Attorney for Appellants**

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule

30(a) and (b) are included in the Appendix.

*/s/  Richard K. Cannon*
Richard K. Cannon

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 24, 2017 the Brief and Short Appendix of Plaintiffs-

Appellants Meryl Squires-Cannon, Richard Kirk Cannon, Royalty Properties, LLC and Cannon

Squires Properties, LLC was filed with the Clerk of the Court for the United States Court of

Appeals for the Seventh Circuit by using the appellate CM/ECF system.  I certify that all

participants in the case are registered CM/ECF users and that service will be accomplished by

the appellate CM/ECF system.


*/s/  Richard K. Cannon*
Richard K. Cannon

# APPENDIX

## TABLE OF CONTENTS TO APPENDIX

Opinion and Order filed 05/09/16, Doc. 81 ................................................................................ A-1

Judgment filed 05/09/16, Doc. 82 ............................................................................................ A-17

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MERYL SQUIRES CANNON; RICHARD KIRK CANNON; ROYALTY PROPERTIES, LLC; and CANNON SQUIRES PROPERTIES, LLC, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 14 C 5611 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| FOREST PRESERVE DISTRICT OF COOK COUNTY, ILLINOIS; BMO HARRIS BANK, N.A.; UNITED STATES OF AMERICA; BAYVIEW LOAN SERVICING, LLC; FRANCIS L. KELDERMANS; McGINLEY PARTNERS, LLC; ROBERT R. McGINLEY; and DOES 1 through 15; | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

In their latest attempt to contest the foreclosure of their property, Plaintiffs Meryl Squires

Cannon and Richard Kirk Cannon (collectively, the "Cannons"), now joined by their wholly-

owned corporations, Royalty Properties, LLC ("RPL") and Cannon Squires Properties, LLC

("CSP"), have filed a second amended complaint against Defendants Forest Preserve District of

Cook County, Illinois (the "FPD"); BMO Harris Bank, N.A. ("BMO"); the United States of

America, acting through its agency, the Federal Deposit Insurance Corporation (the "FDIC");

Bayview Loan Servicing, LLC ("Bayview"); Francis L. Keldermans; McGinley Partners, LLC

("McGinley Partners"); Robert R. McGinley; and unnamed defendants (Does 1–15).[1]  The Court

---

[1] The Court previously dismissed a prior complaint filed by the Cannons against the FPD, BMO, Bayview, and the FDIC for lack of jurisdiction, finding that the United States, and not the FDIC, was the proper Defendant, and that federal jurisdiction was lacking without the United States as a named party. *Cannon v. Forest Pres. Dist. of Cook County*, No. 13 C 6589, 2014 WL 1758475 (N.D. Ill. May 2, 2014). The Cannons then voluntarily dismissed that suit without prejudice and filed the present lawsuit.  Meryl

dismissed the Cannons' initial complaint, finding that they could not proceed against the United States for claims arising from fraud and that they had failed to adequately plead their fraud and conspiracy claims against the remaining Defendants.  In the second amended complaint, Plaintiffs reassert fraud and conspiracy to commit and aid and abet fraud claims against all Defendants but the United States.  But in order to maintain federal jurisdiction, they have added federal takings claims against the FPD, alleging that the FPD unconstitutionally transformed the Cannons' property into a forest preserve through the passage of an ordinance and the foreclosure process, with the remaining Defendants allegedly acting as the FPD's co-conspirators and aiders and abettors.

All Defendants have filed motions to dismiss [61, 62, 64].  Plaintiffs' takings claims fail, as the FPD ordinance at issue merely entailed planning for future acquisition of the property and did not pass any interest in the land to the FPD.  Nor was the FPD's acquisition of the property through the foreclosure process a taking, as the FPD acted in its proprietary, and not sovereign, capacity.  The fraud claims fail because Plaintiffs have not adequately pleaded reliance or damages.  And without underlying wrongful conduct, the conspiracy and aiding and abetting claims cannot proceed on their own.  Thus, the Court grants Defendants' motions and dismisses Plaintiffs' second amended complaint with prejudice.

---

Squires Cannon is also pursuing a separate lawsuit against the FPD and additional defendants, alleging, among other things, that the FPD violated her freedom of movement on the subject property under 42 U.S.C. § 1983.  *See Squires-Cannon v. Forest Pres. Dist. of Cook County, Ill.*, No. 15 C 6876, Doc. 52 (N.D. Ill. Feb. 12, 2016).

A-2

# BACKGROUND[2]

In December 2006, the Cannons, through their two wholly-owned limited liability companies RPL and CSP, purchased a horse farm ("Horizon Farm") in Barrington, Illinois. To finance the purchase, RPL and CSP executed a $14,500,000 mortgage loan agreement with Amcore Bank, N.A. ("Amcore"), which the Cannons personally guaranteed. After the loan matured and the Cannons did not refinance or pay it off, Amcore instituted foreclosure proceedings. Amcore failed in 2009, however, with the FDIC taking over Amcore's assets as receiver. The FDIC entered into an agreement with BMO through which BMO acquired the mortgage and substituted in as the plaintiff in the foreclosure action.

Sometime thereafter, behind closed doors, BMO, Bayview, the FDIC, and Does 1–15 entered into an agreement with the FPD for the FPD to pay $14,000,000 for the mortgage with taxpayer funds.[3] Defendants refused to disclose to the Cannons that the FPD was the contemplated purchaser of the mortgage, despite this agreement. Instead, Keldermans, an attorney, affirmatively represented to the Cannons that the purchaser was a group of individuals operating as an LLC, identifying that LLC in a pre-negotiation and confidentiality agreement presented to them in a February 14, 2013 meeting as "Horizon Farms Loan Acquisition LLC." Doc. 60-2 at 18. The FPD's involvement was masked, in part, because Keldermans and the FPD

---

[2] The facts in the background section are taken from the second amended complaint and the exhibits attached thereto and are presumed true for the purpose of resolving the pending motions to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). The Court has also considered documents attached by Defendants that are referenced in the second amended complaint and central to Plaintiffs' claims. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009). The Court has also taken judicial notice of matters of public record. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997).

[3] Although Horizon Farm had been appraised in October 2007 at over $29 million, its value had fallen by the time of the FPD agreement. An appraisal conducted in September 2012 valued Horizon Farm at $7 million. *See* Doc. 76-1 at 11.

3

A-3

knew the Cannons opposed turning Horizon Farm into a forest preserve. Based on Keldermans'

representations, the Cannons discussed a potential deal with him wherein the "purchaser" would

acquire the mortgage and forego seeking a deficiency judgment against the Cannons if they

waived their ownership claims to Horizon Farm and assigned title to the purchaser. The

Cannons rejected that offer, however. Thereafter, BMO sought court approval for the unnamed

purchaser to inspect the property without disclosing the purchaser's identity.

      Similarly, McGinley, one of the Cannons' neighbors, made overtures to the Cannons

regarding Horizon Farm on the FPD's behalf. McGinley acted in exchange for certain

recognition, compensation, and consideration from the FPD, such as use of Horizon Farm for fox

hunting and equine purposes. On or about March 11, 2013, he met with the Cannons about a

group of neighbors' interest in acquiring part or all of Horizon Farm, indicating the Cannons

could share ownership or alternatively assign title to the group.[4] The Cannons asked for further

details, including the identity of the neighbors, as they indicated they would not negotiate or

share title with certain neighbors. Although they requested a more specific proposal from

McGinley, soon after that conversation, they instead received a revised offer from Keldermans

that for the first time included the opportunity to retain title to the house on Horizon Farm if the

remainder of the property was deeded to the purchaser.

      On June 27, 2013, the FPD executed and closed an assignment and assumption

agreement with BMO, pursuant to which the FPD acquired the mortgage. The agreement was

---

[4] The second amended complaint attaches an email from McGinley, in which McGinley states that he was
only approached by the FPD in May, after his meeting with the Cannons on March 11, and that this
meeting was one he took "in part because of [the Cannons'] encouragement at [the] March 11 meeting."
Doc. 60-2 at 81. This would seemingly contradict Plaintiffs' allegations that McGinley was acting on
behalf of the FPD at the March 11 meeting, but Plaintiffs also allege that another neighbor, Bryan
Cressey, informed the Cannons on May 9 of an earlier meeting in which McGinley presented the FPD
with documents concerning Horizon Farm. The Court only notes this discrepancy in the timing at this
stage.

A-4

entered into with the FDIC's and Bayview's assistance and approval. The FPD thereafter

substituted in as the plaintiff in the foreclosure action. On August 30, 2013, the FPD obtained a

judgment of foreclosure and sale.[5] On October 1, the FPD Board authorized the FPD to bid up

to the judgment amount of $20,449,561.08 at the foreclosure sale. At the same meeting, the FPD

Board enacted an ordinance to convert Horizon Farm to a forest preserve once the FPD acquired

the land. *See* Doc. 60-1at 24–25 (describing that "a unified Forest Preserve be and the same is

hereby created . . . that shall contain and connect lands now owned and lands to be acquired" and

describing that land as Horizon Farm). On October 10, the state court entered an order placing

the FPD in possession of Horizon Farm as of November 18, 2013, requiring the Cannons to

vacate the property as of that date. The FPD prevailed at the foreclosure sale on October 18,

paying $14.5 million. The FPD took title of Horizon Farm on May 16, 2014.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not

its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.

1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-

pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in

the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive

a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a

---

[5] On that same day, the Cannons, along with Todd Baker, filed a state court action against the FPD, the
FPD Board, and BMO (the "*Baker* action"). In the *Baker* action, the Cannons and Baker asserted that the
FPD violated the Forest Preserve and Open Meetings Acts. They sought to prevent foreclosure of
Horizon Farm and to have the assignment and assumption agreement between the FPD and BMO
rescinded. The trial court ruled against the Cannons and Baker. The Cannons and Baker appealed the
ruling on the Forest Preserve Act claims. The Illinois Appellate Court found that the FPD acted within its
statutory authority in acquiring Horizon Farm. *Baker v. Forest Pres. Dist. of Cook County*, 33 N.E.3d
745, 756, 2015 IL App (1st) 141157, 393 Ill. Dec. 1 (2015). The Illinois Supreme Court denied leave to
appeal, *Baker v. Forest Pres. Dist. of Cook County*, 39 N.E.3d 999 (Table), 396 Ill. Dec. 173, and the
*Baker* plaintiffs did not file a petition for writ of certiorari with the United States Supreme Court.

A-5

claim's basis but must also be facially plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct.

1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.

Ct. 1955, 167 L. Ed. 2d 929 (2007).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances

constituting fraud."  Fed. R. Civ. P. 9(b).  This "ordinarily requires describing the 'who, what,

when, where, and how' of the fraud, although the exact level of particularity that is required will

necessarily differ based on the facts of the case."  *AnchorBank*, 649 F.3d at 615 (citation

omitted).  Rule 9(b) applies to "all averments of fraud, not claims of fraud."  *Borsellino v.

Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).  "A claim that 'sounds in fraud'—

in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule

9(b)'s heightened pleading requirements."  *Id.*

## ANALYSIS

### I.    Takings Claims (Counts I, II, and III)

The Fifth Amendment's takings clause (applicable against the states and their

subdivisions through the Fourteenth Amendment) provides that private property shall not "be

taken for public use, without just compensation."  U.S. Const. amend. V.  Plaintiffs bring two

substantive takings claims.  First, they argue that the FPD's enactment of the October 1, 2013

ordinance approving the creation of a forest preserve to include Horizon Farm amounted to a

taking because it imposed significant legal disabilities on the property, reduced its value before

the October 18 foreclosure sale, discouraged other parties from bidding at the sale, and allowed

the FPD to obtain the property at a lower price.  Next, Plaintiffs argue that the FPD effected a

A-6

taking by manipulating the mortgage foreclosure process so as to avoid paying just compensation for Horizon Farm. Finally, Plaintiffs contend that the remaining Defendants are also liable for the alleged takings as co-conspirators and aiders and abettors. The Court addresses these claims in turn.

### A.    The FPD's October 1, 2013 Ordinance to Create a Forest Preserve (Count I)

First, Plaintiffs argue that the enactment of the October 1, 2013 ordinance amounted to a regulatory taking of Horizon Farm. A regulatory taking is "a restriction on the use of property that [goes] 'too far.'"[6] *Horne v. Dep't of Agric.*, --- U.S. ----, 135 S. Ct. 2419, 2427, 192 L. Ed. 2d 388 (2015) (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 67 L. Ed. 322 (1922)); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992) (a regulatory taking occurs "where regulation denies all economically beneficial or productive use of land"). In determining whether a regulatory taking has occurred, the Court considers "the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Horne*, 135 S. Ct. at 2427.

The October 1, 2013 ordinance provides for the creation of a forest preserve from land the FPD would acquire, contemplated to include Horizon Farm. *See* Doc. 60-1 at 24–29. Plaintiffs insist that the ordinance automatically imposed various legal disabilities on Horizon

---

[6] A regulatory taking is distinguished from a physical taking, where the government has a "categorical duty to compensate the former owner." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002). "This longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Id.* at 323.

Farm before the FPD actually took title to the property.[7]  *See* Doc. 60 ¶ 32 (listing the regulatory

powers the FPD gains by statute over land designated as a forest preserve, including regulating

the speed on roadways, regulating modes of travel, issuing licenses for particular activities, and

maintaining a police force).  But the Court need not accept Plaintiffs' allegations of the effects of

the ordinance because the effect of the ordinance is a question of law.  *See Stahelin v. Forest*

*Pres. Dist. of DuPage County*, 877 N.E.2d 1121, 1129, 376 Ill. App. 3d 765, 315 Ill. Dec. 792

(2007) (refusing to accept plaintiffs' perceptions of the effect of an ordinance, noting that "the

interpretation of an ordinance is a question of law").

        Examining the ordinance's language, the Court fails to see how it could qualify as a

regulatory taking.  The ordinance did not give the FPD power to regulate, limit, or control

Plaintiffs' ability to use Horizon Farm while it remained under Plaintiffs' ownership.  Instead, it

merely provides that, to the extent the FPD acquired Horizon Farm in the future, it would

become part of a forest preserve.  Such a prospective enactment does not qualify as a taking.  *See*

*Davis v. Brown*, 851 N.E.2d 1198, 1204–05, 221 Ill. 2d 435, 303 Ill. Dec. 773 (2006) (Illinois

Department of Transportation's filing of a map indicating future rights of way did not constitute

a regulatory taking); *Griffin v. City of N. Chicago*, 445 N.E.2d 827, 905, 112 Ill. App. 3d 901, 68

Ill. Dec. 183 (1983) ("Generally, the adoption of a resolution or the entering into negotiations to

acquire land does not pass any interest in that land.").  In fact, Plaintiffs' claim was rejected in

almost the exact same situation over seventy years ago by the Illinois Supreme Court,

---

[7] In their response, Plaintiffs also represent that the FPD publicly labeled Horizon Farm a forest preserve
on physical signs before it held title, erecting signs at Horizon Farm's entrances stating it was FPD
property.  *See* Doc. 73 at 11, 15.  Although these allegations are not included in the second amended
complaint, the Court may consider them because they are consistent with the allegations in the second
amended complaint.  *See Help at Home, Inc. v. Med. Capital, LLC*, 260 F.3d 748, 752–53 (7th Cir. 2001).
But even accepting that the FPD erected signs on the property at some point prior to taking title, as
explained below, this does not change the Court's analysis of whether the ordinance at issue amounts to a
regulatory taking.

A-8

underscoring that no taking occurred here. *See Eckhoff v. Forest Pres. Dist. of Cook County*, 36 N.E.2d 245, 248–49, 377 Ill. 208 (1941) (a property owner was not entitled to compensation for the alleged damages caused by the forest preserve district's passage of an ordinance designating certain portions of the property owner's land part of an intended forest preserve and the subsequent delay in the forest preserve's acquisition of that land).  In holding that no taking occurred, the Illinois Supreme Court observed that "[t]he fact that at some future time a municipal corporation, with power of eminent domain, may require the land of a private owner, is one of the conditions on which the owner holds land in this State." *Id.* at 248.  The same can be said here, with the ordinance amounting to no more than "mere planning or plotting in anticipation of a public improvement." *City of Chicago v. Loitz*, 329 N.E.2d 208, 211, 61 Ill. 2d 92 (1975); *see also Stahelin*, 877 N.E.2d at 1130–31 (ordinance was not a taking where it "provides the District no enforcement mechanism to regulate plaintiffs' property" and was "at most planning in anticipation of a possible future taking and do[es] not effect a taking itself"); *cf. Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 14–15, 104 S. Ct. 2187, 81 L. Ed. 2d 1 (1984) (taking does not occur in condemnation proceeding until title passes to government because prior to that, the landowner is free to do what he wants with the land, even if the existence of the condemnation proceedings "reduced the price that the land would have fetched," since "impairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking"); *Agins v. City of Tiburon*, 447 U.S. 255, 263 n.9, 100 S. Ct. 2138, 65 L. Ed. 2d 106 (1980) (rejecting argument that precondemnation activities constitute taking), *abrogated on other grounds by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005).  Thus, the October 1, 2013 ordinance did not amount to a taking and the Court dismisses the claim with prejudice.

9

A-9

**B.      The FPD's Foreclosure Actions (Count II)**

Plaintiffs also bring a physical takings claim, alleging that the FPD's actions in taking

possession of Horizon Farm through the foreclosure process amounted to a taking without just

compensation.  The FPD responds that its actions in acquiring Horizon Farm cannot support a

takings claim because it acquired the property not through its eminent domain powers but rather

private contractual means as authorized by the Forest Preserve District Act.  *See Baker*, 33

N.E.3d at 754–56 (noting the FPD's ability to acquire land "by gift, grant, purchase, or

condemnation" and concluding that the FPD was "within its statutory authority to acquire the

property in the manner it did").  Because the FPD was acting as a private party and not in its

sovereign capacity, the FPD argues that Plaintiffs can only take advantage of contractual

remedies to contest the FPD's actions.  *See Lawndale Restoration Ltd. P'ship ex rel. Boulevard*

*Realty Servs. Corp. v. United States*, 95 Fed. Cl. 498, 511–12 (Fed. Cl. 2010) (because HUD

undertook foreclosure in its proprietary capacity as mortgagee, the plaintiff was not entitled to

compensation under the takings clause).

The Court agrees with the FPD that Plaintiffs do not have a takings claim for any of the

FPD's actions connected to its acquisition of the mortgage and Horizon Farm through the

foreclosure sale because the FPD acted in its proprietary, and not sovereign, role throughout the

process.  *See A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1156 (Fed. Cir. 2014)

("Proprietary government action typically involves bargaining with private actors for the

provision or procurement of goods and services; the action is deemed proprietary even though

the government may enter into the contractual relationship in pursuit of a larger governmental

objective.").  As the Illinois Appellate Court found in *Baker*, and even the Cannons

acknowledged in that action, the FPD acquired the property as a private party not through

10

A-10

eminent domain but rather by purchasing the mortgage and participating in the foreclosure sale.
*Baker*, 33 N.E.3d at 748, 754–55. Because the FPD acted as a private party, no taking requiring

just compensation occurred, leaving Plaintiffs only with any remedies that were available to

them in the foreclosure process.[8] *See St. Christopher Assocs., L.P. v. United States*, 511 F.3d

1376, 1385 (Fed. Cir. 2008) ("In general, takings claims do not arise under a government

contract because . . . the government is acting in its proprietary rather than its sovereign capacity,

and because remedies are provided by the contract."); *Warren v. Gov't Nat'l Mortg. Ass'n*, 611

F.2d 1229, 1234 (8th Cir. 1980) ("[M]ortgage foreclosures . . . are not in and of themselves

powers of a governmental nature."); *Syriani v. Freddie Mac Multiclass Certificates, Series 3365*,

No. CV 12-3035-JFW (JEMx), 2012 WL 6200251, at *4 (C.D. Cal. July 10, 2012) (no taking

occurs where a governmental entity "is merely acting as a private party enforcing a contract" and

"not acting as a sovereign to expropriate private property"); *Klump v. United States*, 50 Fed. Cl.

268, 271 (Fed. Cl. 2001) ("[W]hen the government simply asserts its ultimate right to ownership

of an interest in property through the same legal channels that any other individual would

employ to assert such an interest, no taking under the Fifth Amendment occurs."). Thus, the

Court dismisses Plaintiffs' physical takings claim with prejudice.

### C.    Conspiracy to Commit and Aiding and Abetting the FPD's Takings (Count III)

Finally, Plaintiffs allege that the non-FPD Defendants conspired with and aided and

abetted the FPD in committing the alleged taking of Horizon Farm. As the Court already noted

in its prior opinion in this case, a conspiracy claim cannot survive where a plaintiff fails to state

an underlying cause of action. Doc. 40 at 10; *see also Sow v. Fortville Police Dep't*, 636 F.3d

---

[8] The state foreclosure process appears to have concluded. Because all potential claims Plaintiffs could have brought concerning the foreclosure process are foreclosed as a result, the Court will not address Plaintiffs' theories that the FPD improperly manipulated the foreclosure process.

A-11

293, 305 (7th Cir. 2011) ("[T]he absence of any underlying violation of Plaintiff's rights

precludes the possibility of Plaintiff succeeding on a conspiracy claim.").  Similarly, Plaintiffs'

aiding and abetting claims require independent underlying conduct to be viable.  *See Hefferman*

*v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (although aiding and abetting is not an independent

tort, it "is a theory for holding the person who aids and abets liable for the tort itself").  Because

no taking occurred, the Court dismisses Plaintiffs' conspiracy and aiding and abetting claims.[9]

## II.    Fraud Claims (Counts IV, V, and VI)[10]

In its prior opinion addressing the Cannons' original complaint, the Court dismissed the

fraud claims against the non-FDIC Defendants without prejudice, finding that they did not

sufficiently allege reliance, a duty to disclose, or damages, and additionally that the Cannons had

not pleaded their fraud claims with sufficient particularity pursuant to Rule 9(b).  *See* Doc. 40 at

6–9.  Additionally, the Court dismissed the conspiracy to commit fraud claims for lack of any

underlying wrongful conduct.  *Id.* at 10.  Plaintiffs have repleaded these claims in an attempt to

cure the identified defects, bringing direct fraud claims against Keldermans, the FPD, McGinley,

and McGinley Partners, and also alleging that all non-FDIC Defendants were co-conspirators

---

[9] Defendants raise a number of other reasons for dismissing the takings claims, but the Court need not address them, having found that the takings claims fail on other grounds.

[10] Because the Court is dismissing the claims over which it has original jurisdiction with prejudice, the Court has discretion to decline to exercise supplemental jurisdiction over the remaining state law fraud claims.  *See* 28 U.S.C. § 1367(c); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").  The Seventh Circuit, however, urges district courts to exercise their discretion to retain jurisdiction where substantial judicial resources have been expended on resolution of the supplemental claims or "where it is obvious how the claims should be decided."  *See Williams Elec. Games, Inc. v. Garrity*, 479 F.2d 904, 906–07 (7th Cir. 2007) (collecting cases).  District courts should consider, at every stage of the litigation, whether supplemental jurisdiction serves "the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997).  Here, in the interest of judicial efficiency and in light of the Court's familiarity with the fraud claims, the Court retains jurisdiction over the supplemental state law claims and addresses the non-FDIC Defendants' remaining arguments for dismissal of these claims.

and aiders and abettors of the alleged fraud.  The non-FDIC Defendants argue that these claims have the same pleading deficiencies identified by the Court in its prior opinion and so must be dismissed with prejudice.

To state a claim for fraud, Plaintiffs must allege that (1) Defendants made a false statement or omission of material fact, (2) Defendants knew of or believed in its falsity, (3) Defendants intended to induce Plaintiffs to act, (4) Plaintiffs acted in reliance on the truth of Defendants' statements, and (5) damages resulted from Plaintiffs' reliance.  *Weidner v. Karlin*, 932 N.E.2d 602, 605, 402 Ill. App. 3d 1084, 342 Ill. Dec. 475 (2010).  Additionally, to the extent Plaintiffs claim fraudulent concealment, they must allege that Defendants had a duty to disclose the omitted fact to them.  *Id.*; *see also Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir. 2013).

Against Keldermans and the FPD, Plaintiffs allege that, at the FPD's request, Keldermans met with the Cannons to discuss an offer regarding Horizon Farm, affirmatively misrepresenting that a group of individuals, operating under the name of "Horizon Farms Loan Acquisition LLC," was interested in acquiring the property.  Plaintiffs further allege that Keldermans failed to disclose that the FPD was behind the LLC despite knowing that the FPD could not own or operate as an LLC and that Plaintiffs opposed efforts to turn Horizon Farm into a forest preserve. Plaintiffs contend Keldermans made the representations to insulate the FPD from any challenge to its plans to use public funds to purchase the mortgage, keeping Plaintiffs from gaining knowledge of the FPD's plans and from fully participating in what should have been an open governmental process.  They claim these misrepresentations and omissions allowed the FPD to gain an upper hand and kept BMO from accepting the Cannons' settlement offer even though it

13

A-13

equaled what the FPD paid for Horizon Farm.  They also claim as damages displacement from

Horizon Farm and being placed in a worse negotiating position.

As for their claim against McGinley, McGinley Partners, and the FPD, Plaintiffs allege

that McGinley misrepresented that a group of neighbors wanted to acquire part of Horizon Farm

without revealing their identity or that McGinley was acting to facilitate the FPD's acquisition of

Horizon Farm.  Although the Cannons inquired about the identity of the group of neighbors,

Plaintiffs allege that McGinley remained silent despite knowing that Plaintiffs did not want the

FPD to acquire the property.  Plaintiffs claim they relied on McGinley's silence and disclosed

their willingness to negotiate with this group, which allegedly prevented them from timely

opposing the FPD's acquisition of the property, kept BMO from accepting the Cannons' offer,

and subjected Plaintiffs to additional litigation and expenses.

For many of the same reasons the Court dismissed the Cannons' fraud claims in its prior

opinion, these allegations also fail to set forth cognizable claims of fraud.  First, Plaintiffs have

again failed to sufficiently allege the required reliance element.  In their second amended

complaint, Plaintiffs admit that they are complaining of transactions they did not consummate or

with which they were not even involved but attempt to get around this fact by claiming that they

nonetheless entered into confidential discussions with Keldermans and McGinley regarding the

property.[11]  The fact that they refused to enter into transactions with the alleged private parties,

who turned out to be the FPD, cannot form the basis of a fraud claim.  Even if they engaged in

discussions with Keldermans or McGinley, without thereafter entering into the transactions,

---

[11] Although Plaintiffs claim they signed a pre-negotiation and confidentiality agreement, the agreement
attached to their second amended complaint, which trumps their allegations, is unsigned.  Doc. 60-2 at 18;
*See Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010) ("Where [the complaint's] allegations are
contradicted by written exhibits that [plaintiff] attached to his amended complaint, . . . the exhibits trump
the allegations.").

14

A-14

Plaintiffs cannot claim that they relied on any misrepresentations or omissions made by Keldermans or McGinley to their detriment. *See Reid v. Harvey Motorcycle & Camper*, No. 05 C 5375, 2007 WL 4277435, at *6 (N.D. Ill. Nov. 30, 2007) ("Reid must demonstrate that he entered into a transaction in reliance on Watson's fraudulent statements and suffered damages as a result of his reliance. Since Reid did not enter into a transaction with Watson in reliance on Watson's fraudulent statements, and cannot demonstrate any damages suffered individually by him alone, his claim once again fails at the fourth and fifth requirements, and the claim must be dismissed.").

Additionally, Plaintiffs' damages allegations suffer from the same defect identified in the Court's prior opinion: their alleged damages arise from their own actions in failing to pay their mortgage and not from the alleged concealment of the fact that the FPD was purchasing the mortgage. *See* Doc. 40 at 8. Although Plaintiffs claim that they were harmed because they were unable to intervene earlier in the FPD's scheme to purchase the mortgage, this ignores the fact that BMO could sell the note to anyone without notice or consent. *See* Doc. 63-1 at 7.[12] Any claimed damages were of Plaintiffs' own making, and their claim to have been harmed because they relied on the failure to identify the FPD as the purchaser of the mortgage fails. *See Cohen*, 735 F.3d at 614 (finding plaintiff did not allege damages for purposes of fraud claim where the defendant was authorized to impose charges and the plaintiff was required to pay them). Thus, the Court dismisses Plaintiffs' fraud claims.[13] Because there is no underlying fraud claim, the

---

[12] The Court may consider the note, attached to the FPD, BMO, Bayview, and Keldermans' motion to dismiss, because Plaintiffs reference it in the second amended complaint and it is central to Plaintiffs' claims. *See Hecker*, 556 F.3d at 582–83.

[13] Because the Court finds that Plaintiffs have failed to sufficiently allege reliance and damages, both required elements of a fraudulent misrepresentation or concealment claim, the Court need not address the non-FDIC Defendants' arguments that Plaintiffs have also not adequately alleged that Keldermans and McGinley had a duty to disclose or that the Cannons lack standing to assert the fraud claims.

Court also dismisses the conspiracy to commit fraud and aiding and abetting fraud claim.  *See Zachman v. Vohra*, No. 1:15 CV 5293, 2015 WL 7423783, at *6–7 (N.D. Ill. Nov. 23, 2015) (dismissing aiding and abetting and conspiracy claims because plaintiff had not adequately pleaded an underlying fraud claim); *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662, 316 Ill. App. 3d 416, 249 Ill. Dec. 45 (2000) (because "conspiracy is not an independent tort . . . . [w]here, as here, a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails").

Given the fact that Plaintiffs were previously allowed to cure the deficiencies identified by the Court and failed to do so, the dismissal of Plaintiffs' fraud, conspiracy to commit fraud, and aiding and abetting fraud claims is with prejudice.  *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 734–35 (7th Cir. 2014) (affirming dismissal with prejudice of first amended complaint after initial complaint was dismissed without prejudice); *Pirelli Armstrong Tire Corp., Retiree Med. Benefits Trust v. Walgreen Co.*, No. 09 C 2046, 2010 WL 624709, at *1 (N.D. Ill. Feb. 18, 2010) (dismissing amended complaint with prejudice after previous dismissal of ICFA and unjust enrichment claims without prejudice), *aff'd*, 631 F.3d 436 (7th Cir. 2011).

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions to dismiss [61, 62, 64]. The Court dismisses the second amended complaint with prejudice.  This case is terminated.

Dated: May 9, 2016

_____
SARA L. ELLIS
United States District Judge

16

A-16

Case: 16-3131    Document: 17    Filed: 02/24/2017    Pages: 74
ILND 450 (Rev. 01/14) Judgment in a Civil Action
Case: 1:14-cv-05611 Document #: 82 Filed: 05/09/16 Page 1 of 3 PageID #:1530

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Meryl Squires Cannon et al,

Plaintiff(s),

v.

Forest Preserve District of Cook County, Illinois et al,

Defendant(s).

Case No.  14-cv-5611
Judge Sara L. Ellis

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which ☐ includes          pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒    in favor of defendant(s) Forest Preserve District of Cook County, Illinois, BMO Harris Bank, N.A., United States of America, Bayview Loan Servicing, LLC, McGinley Partners, LLC, Robert R. McGinley, and Francis L. Keldermans.
and against plaintiff(s) Meryl  Squires Cannon, Richard Kirk Cannon, Royalty Properties, LLC and Cannon Squires Properties, LLC.
.

Defendant(s) shall recover costs from plaintiff(s).

---

☐    other:

---

This action was (check one):

☐ tried by a jury with Judge          presiding, and the jury has rendered a verdict.
☐ tried by Judge          without a jury and the above decision was reached.
☒ decided by Judge Sara L. Ellis  on a motion to dismiss complaint.

Date:  5/9/2016                    Thomas G. Bruton, Clerk of Court

A-17

Rhonda Johnson, Deputy Clerk